[No. S119869. Jan. 31, 2005.]

AMERICAN FINANCIAL SERVICES ASSOCIATION, Plaintiff and
Appellant, v.
CITY OF OAKLAND et al., Defendants and Appellants.

1240

## COUNSEL

Severson & Werson, Mark Joseph Kenney, Jan T. Chilton and Donald J. Querio for Plaintiff and Appellant.

Arnold & Porter, Laurence J. Hutt, Dennis G. Lyons, Howard N. Cayne, Michael C. O'Brien and Nancy L. Perkins for California Bankers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Horvitz & Levy, Lisa Perrochet and Bradley S. Pauley for National Home Equity Mortgage Association as Amicus Curiae on behalf of Plaintiff and Appellant.

John A. Russo, City Attorney, Barbara J. Parker, Chief Assistant City Attorney, John Truxaw and Daniel Rossi, Deputy City Attorneys; Cotchett, Pitre, Simon & McCarthy, Joseph W. Cotchett, Marie Seth Weiner, Steven N. Williams and Jamie N. Gonzalez for Defendants and Appellants.

Norma P. Garcia for Consumers Union of U.S., Inc., as Amicus Curiae on behalf of Defendants and Appellants.

Kevin D. Stein for California Reinvestment Committee as Amicus Curiae on behalf of Defendants and Appellants.

Maeve Elise Brown for the National Housing Project, AARP, Association of Community Organizations for Reform Now (ACORN), Congress of California Seniors, Consumer Credit Counseling Service of the East Bay, Lao Family

Community Development, Inc., and Spanish Speaking Unity Council of Alameda County, Inc., as Amici Curiae on behalf of Defendants and Appellants.

Paul S. Cohen for Centro Legal de la Raza and La Raza Centro Legal as Amicus Curiae on behalf of Defendants and Appellants.

Robert Gnaizda for Greenling Institute as Amicus Curiae on behalf of Defendants and Appellants.

Patricia G. Price for Legal Assistance for Seniors as Amicus Curiae on behalf of Defendants and Appellants.

John T. Fellows III, City Attorney (Torrance) for The League of California Cities as Amicus Curiae on behalf of Defendants and Appellants.

---

## OPINION

**BROWN, J.**— ██ "Predatory lending" is a term generally used to characterize a range of abusive and aggressive lending practices, including deception or fraud, charging excessive fees and interest rates, making loans without regard to a borrower's ability to repay, or refinancing loans repeatedly over a short period of time to incur additional fees without any economic gain to the borrower. Predatory lending is most likely to occur in the rapidly growing "subprime" mortgage market, which is a market generally providing access to borrowers with impaired credit, limited income, or high debt relative to their income. Mortgages in this market tend to be in smaller amounts, and with faster prepayments and significantly higher interest rates and fees, than "prime" mortgages.

In 2001, California enacted legislation to combat predatory lending practices that typically occur in the subprime home mortgage market. (Fin. Code,[1] §§ 4970–4979.8 (Division 1.6).)[2] Eight days before Division 1.6 was signed into law by the Governor, the City of Oakland adopted an ordinance regulating predatory lending practices in the Oakland home mortgage market.[3]

---

[1] All further undesignated statutory references are to this code.

[2] Assembly Bill No. 489 (2001–2002 Reg. Sess.) (Assembly Bill No. 489) added Division 1.6. (Stats. 2001, ch. 732, §§ 1, 3–5.) A trailer bill, Assembly Bill No. 344 (2001–2002 Reg. Sess.) (Assembly Bill No. 344), made certain changes to Division 1.6. (Stats. 2001, ch. 733, §§ 1–10.) Both bills were signed into law on October 10, 2001.

[3] Oakland's "Anti-Predatory Lending Ordinance" (Oak. Ord. No. 12361 CMS) is codified at Oakland Municipal Code chapter 5.33 (Ordinance). The City of Oakland also amended its

■ We consider whether the Ordinance is preempted by Division 1.6, and if not, whether the Ordinance is nevertheless preempted by Civil Code section 1916.12. We conclude that the Ordinance is preempted by Division 1.6, and therefore reverse the judgment of the Court of Appeal.

## I. Factual and Procedural Background[4]

On October 15, 2001, American Financial Services Association (AFSA) filed this action against the City of Oakland and the Redevelopment Agency of the City of Oakland (City) seeking a declaration that the Ordinance was preempted by state law, and an injunction against its enforcement. On October 25, 2001, by stipulated order, the Ordinance was stayed pending, as relevant here, final resolution of this action. In December 2001, the trial court denied AFSA's motion for a preliminary injunction against enforcement of the Ordinance, and AFSA appealed from that order.

The parties then filed cross-motions for summary judgment. On June 21, 2002, the trial court entered an order finding that the Ordinance was preempted to the extent that it exempted federally chartered lending institutions from its restrictions. The court held that the sentence exempting such institutions should be severed from the Ordinance. Subject to elimination of the federal exemption, the court denied AFSA's summary judgment motion and granted the City's. Judgment was entered severing the sentence exempting federal lenders, dismissing AFSA's complaint, and deeming the Ordinance valid as modified.

AFSA appealed from the judgment, and the City cross-appealed. The Court of Appeal ordered the appeals and cross-appeal consolidated. The court held the Ordinance was not preempted by either Division 1.6 or Civil Code section 1916.12. It reversed the trial court's judgment insofar as it ordered severance of the portion of the Ordinance exempting federally chartered lenders from its coverage. In all other respects, the judgment was affirmed. AFSA's appeal from the denial of its motion for a preliminary injunction was dismissed as moot.

We granted AFSA's petition for review.

linked banking services ordinance to require lenders seeking to do business with the City or participate in certain projects or programs that involved the City, to certify that neither they nor their affiliates engage in predatory lending practices, and adopted a resolution seeking a similar certification from financial institutions desiring to participate in any development projects financed by the Redevelopment Agency. There is no dispute that the validity of the other measures depends on the validity of the Ordinance, and we do not discuss them further.

[4] Because there was no petition for rehearing in the Court of Appeal, we take our statement of facts largely from that court's opinion. (Cal. Rules of Court, rule 28(c)(2); *People v. Hernandez* (2004) 33 Cal.4th 1040, 1045 [16 Cal.Rptr.3d 880, 94 P.3d 1080].)

## II. Discussion

### A. *Background*

■    According to its legislative history, the purpose of Division 1.6 was to regulate and thereby curtail predatory lending practices that typically occur in the subprime mortgage market.[5] Division 1.6 applies to any "covered loan," which is a "consumer loan in which the original principal balance of the loan does not exceed" $250,000 "in the case of a mortgage or deed of trust," and either of two conditions are met.[6] (§ 4970, subd. (b)(1)(A), (B).) A "consumer loan" is defined as "a consumer credit transaction that is secured by real property located in this state used, or intended to be used or occupied, as the principal dwelling of the consumer that is improved by a one-to-four residential unit." (§ 4970, subd. (d).) A consumer loan does not include a bridge loan, a reverse mortgage, an open line of credit as defined by federal regulation, or a "consumer credit transaction that is secured by rental property or second homes." (§ 4970, subd. (d).)

Division 1.6 contains numerous prohibitions and limitations with respect to covered loans. For example, a person who originates covered loans shall not (1) "make a covered loan that finances points and fees in excess of" the higher of $1,000 or 6 percent of the original principal balance, exclusive of points and fees (§ 4979.6); (2) "make or arrange a covered loan unless at the time the loan is consummated, the person reasonably believes the con-sumer . . . will be able to make the scheduled payments to repay the obligation based" on specified factors (§ 4973, subd. (f)(1)); (3) "pay a contractor under a home-improvement contract from the proceeds of a covered loan other than by an instrument payable to the consumer," both the consumer and the contractor, or under certain circumstances to a third party escrow agent (*id.*, subd. (g)); (4) "recommend or encourage a consumer to

---

[5] Division 1.6 does not use the term "subprime," and the term has no standard industry definition. (U.S. Dept. of the Treasury & U.S. Dept. of Housing and Urban Development, Joint Rep., Curbing Predatory Home Mortgage Lending (June 2000) p. 27.) It generally, however, refers to loans in smaller amounts, with significantly higher interest rates and fees, and faster prepayments, than "prime loans." (*Id.*, p. 28.) "Predatory lending occurs primarily in the subprime mortgage lending market." (*Id.*, p. 2.) Both Division 1.6 and the Ordinance address predatory practices regarding such high-cost loans, and the legislative history of Division 1.6 is replete with references to "subprime" lending. Therefore, like the Court of Appeal, we will at times refer to both the Ordinance and Division 1.6 as regulating predatory practices in the "subprime" mortgage market.

[6] "For a mortgage or deed of trust, the annual percentage rate at consummation of the transaction will exceed by more than eight percentage points the yield on Treasury securities having comparable periods of maturity on the 15th day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor" or the "total points and fees payable by the consumer at or before closing for a mortgage or deed of trust will exceed 6 percent of the total loan amount." (§ 4970, subd. (b)(1)(A), (B).)

default on an existing consumer loan or other debt in connection with the solicitation or making of a covered loan that refinances all or any portion of the existing consumer loan or debt" (*id.*, subd. (h)); (5) "refinance or arrange for the refinancing of a consumer loan such that the new loan is a covered loan that is made for the purpose of refinancing, debt consolidation or cash out, that does not result in an identifiable benefit to the consumer" after considering various factors (*id.*, subd. (j)); (6) "steer, counsel, or direct any prospective consumer to accept a loan product with a risk grade less favorable than the risk grade that the consumer would qualify for" based on certain information (*id.*, subd. (*l*)(1)); (7) "finance, directly or indirectly, into a consumer loan or finance to the same borrower within 30 days of a consumer loan any credit life, credit disability, credit property, or credit unemployment insurance premiums, or any debt cancellation or suspension agreement fees, provided that credit insurance premiums, debt cancellation, or suspension fees calculated and paid on a monthly basis shall not be considered financed by the person originating the loan" (§ 4979.7); (8) structure a loan transaction as an open-end credit plan for the purpose of evading Division 1.6 if the "loan would have been a covered loan if the loan had been structured as a closed end loan" (§ 4973, subd. (m)(1)); (9) divide any loan transaction into separate parts for the purpose of evading Division 1.6 (§ 4973, subd. (m)(2)); or (10) "act in any manner, whether specifically prohibited by this section or of a different character [*sic*], that constitutes fraud" (*id.*, subd. (n)).

Moreover, a covered loan shall not (1) include a "prepayment fee or penalty after the first 36 months after the date of" loan consummation, but "may include a prepayment fee or penalty up to the first 36 months after the date of" loan consummation under certain conditions (§ 4973, subd. (a)(1), (2)); (2) "contain a provision for negative amortization such that the payment schedule for regular monthly payments causes the principal balance to increase, unless the covered loan is a first mortgage" and appropriate disclosure made (*id.*, subd. (c)); (3) "include terms under which periodic payments required under the loan are consolidated and paid in advance from the loan proceeds" (*id.*, subd. (d)); (4) "contain a provision that increases the interest rate as a result of a default" except under certain circumstances (*id.*, subd. (e)); (5) generally "contain a call provision that permits the lender, in its sole discretion, to accelerate the indebtedness" (*id.*, subd. (i)); or (6) be made unless a seven-paragraph disclosure form set forth in section 4973, subdivision (k)(1), which includes encouragement to the borrower to consider financial counseling, is provided to the consumer no later than three business days before signing of the loan documents. A "covered loan with a term of 5 years or less may not provide at origination for a payment schedule with regular periodic payments that when aggregated do not fully amortize the principal balance as of the maturity date of the loan." (§ 4973, subd. (b)(1).)

"For a payment schedule that is adjusted to account for the seasonal or irregular income of the consumer, the total installments in any year shall not exceed the amount of one year's worth of payments on the loan." (§ 4973, subd. (b)(2).) In addition, a "person who provides brokerage services to a borrower in a covered loan transaction by soliciting lenders or otherwise negotiating a consumer loan secured by real property, is the fiduciary of the consumer, and any violation of the person's fiduciary duties shall be a violation of" section 4979.5. (§ 4979.5, subd. (a).) "Except for a broker or a person who provides brokerage services," however, "no licensed person or subsequent assignee shall have administrative, civil, or criminal liability for a violation of" section 4979.5. (§ 4979.5, subd. (b).)

Similarly, the Ordinance regulates predatory lending practices in home loans in Oakland. (Oak. Mun. Code, §§ 5.33.010, 5.33.030.) A "home loan" does not include a reverse mortgage, and is defined as a "loan of money, including without limitation a line of credit or an open-end credit plan," if certain criteria apply. (*Id.*, § 5.33.030.) One criteria is that the "principal amount of the loan does not exceed the current conforming first mortgage loan size limit for a single-family dwelling as established by the Federal National Mortgage Association." (*Ibid.*) Since January 1, 2005, that amount has been $359,650.[7] In addition, the borrower must incur the loan primarily for personal, family, or household uses, and the loan must be secured in whole or in part by a deed of trust, mortgage, or similar security device on real property located within Oakland. (Oak. Mun. Code, § 5.33.030.) The real property must (or will) contain either one to four residential units or "individual residential units of condominiums or cooperatives," one of which is or will be the borrower's principal dwelling. (*Ibid.*)

A "high-cost" home loan is a home loan that meets one of two specified thresholds.[8] (Oak. Mun. Code, § 5.33.030.) The Court of Appeal observed

---

[7] (Http://www.fanniemae.com/aboutfm/loanlimits.jhtml?p=About+Fannie+Mae&s=Loan +Limits [as of Jan. 31, 2005].)

[8] The "annual percentage rate of the loan equals or exceeds (a) by more than 3 percentage points, if the home loan is a first mortgage, or (b) by more than 5 percentage points, if the home loan is a junior mortgage, the rate set by the required net yield for a 90-day standard mandatory delivery commitment for a first mortgage loan from either the Federal National Mortgage Association (FannieMae) or the Federal Home Loan Mortgage Association, which-ever is greater, as such yield is reported on the fifteenth day of the month immediately preceding the month in which the application for the home loan is received by the lender; or (2) the total points and fees on the loan equal or exceed either 5% of the total loan amount or $800, whichever amount is greater. If the terms of the home loan provide for an initial or introductory period during which the annual percentage rate is lower than that which will apply after the end of such initial or introductory period, then the annual percentage rate to be considered for purposes of this definition is the rate which applies after the initial or introductory period. If the terms of the home loan provide for an annual percentage rate that varies in accordance with an index plus a margin, then the annual percentage rate to be

that the " 'high-cost home loan' interest rate and fee thresholds are both lower than the threshold levels for 'covered loans' set by [Division 1.6]. . . ." "[I]t is undisputed that the high-cost loan provisions of the Ordinance would apply to all home loans falling under the 'covered loan' provisions of the state statute, and also reach some loans that do not come under the state law provisions."

Like Division 1.6, the Ordinance contains numerous prohibitions and limitations with respect to home loans and "high-cost" home loans. The Ordinance prohibits prepayment penalties for high-cost and certain refinanced home loans, and limits prepayment penalties for other home loans. (Oak. Mun. Code, § 5.33.040(A).) For home loans generally, no lender may (1) "finance any credit life, credit disability, credit property, or credit unemployment insurance, or any other life or health insurance premiums when making a home loan"; (2) "recommend or encourage a borrower to default or not to make a payment on a home loan or any other debt, when such lender action is in connection with the closing or planned closing of a home loan that refinances all or part of the borrower's debt"; or (3) "make a home loan that violates any applicable provision" of certain federal laws regulating lending. (Oak. Mun. Code, § 5.33.040(B), (C), (D).)

In addition, the following practices are prohibited for high-cost home loans: (1) making the loan without obtaining written certification from an independent and approved housing or credit counselor that the borrower has contacted the counselor and either received counseling about the advisability of the loan transaction or waived in writing the counseling option; (2) making a loan unless the lender reasonably believes the borrower will be able to make the scheduled payments based on certain detailed criteria; (3) financing points and fees exceeding $800 or 5 percent of the loan amount, whichever is greater; (4) making a loan "that includes terms under which more than two periodic payments required under the loan are consolidated and paid in advance from the loan proceeds provided to the borrower"; (5) charging a fee to modify, renew, extend, or amend a loan or defer any payment, except under certain conditions; (6) including terms that allow the lender to accelerate the indebtedness in its discretion except for certain circumstances; (7) including a provision increasing the interest rate if the borrower defaults or is delinquent, except in certain circumstances; (8) making a loan that "pays off all or part of an existing home loan or other debt of the borrower, and the borrower does not receive a reasonable and tangible net benefit from the new

---

considered for purposes of this definition is the rate that is in effect on the date of loan consummation. In the case of a home loan with a regular interest rate that varies in accordance with an index plus a margin, but with an initial or introductory interest rate established in some other manner, the annual percentage rate to be considered is the rate that would have been in effect on the date of loan consummation were the regular rate determined by the index plus the margin to apply, that is, the fully-indexed rate on the date of loan consummation." (Oak. Mun. Code, § 5.33.030.)

high-cost home loan considering all the circumstances," as delineated; and (9) making a loan that "pays off all or part of an existing home loan, and such existing loan" is a specified government or nonprofit loan unless an independent housing or credit counselor has determined that the refinance is in the borrower's best interests. (Oak. Mun. Code, § 5.33.050.)

Thus, Division 1.6 and the Ordinance are similar in that they regulate the same subject matter, i.e., predatory lending practices in home mortgages. However, Division 1.6 and the Ordinance differ in significant respects with regard to how they regulate these predatory practices. For example, Division 1.6 does "not impose liability on an assignee that is a holder in due course" and the provisions of the division do not apply to "persons chartered by Congress to engage in secondary mortgage market transactions." (Fin. Code, § 4979.8.) The Ordinance expressly applies to a holder in due course. (Oak. Mun. Code, § 5.33.070 ["Any person who purchases or is otherwise assigned a home loan is subject to all claims, actions and defenses related to that home loan that the borrower, the City Attorney, or others could assert against the original lender"].) Moreover, Division 1.6 permits prepayment penalties under certain conditions during the first 36 months of the loan; the Ordinance prohibits them for all high-cost and certain refinanced home loans, and limits them for other home loans. (Fin. Code, § 4973, subd. (a); Oak. Mun. Code, § 5.33.040(A).) In addition, Division 1.6 requires that borrowers be encouraged in writing to seek loan counseling; the Ordinance prohibits a high-cost home loan being made without either the borrower receiving loan counseling or giving the credit counselor a written waiver of counseling. (Fin. Code, § 4973, subd. (k)(1); Oak. Mun. Code, § 5.33.050(A).)

In addition to other enforcement mechanisms, Division 1.6 and the Ordinance both allow for civil and criminal penalties and for civil enforcement by borrowers, including punitive damages. (Fin. Code, §§ 4975, subd. (c), 4977, subds. (b), (c), 4978, subds. (a), (b)(2); Oak. Mun. Code, §§ 5.33.080, 5.33.100.) However, Division 1.6 imposes civil penalties up to $25,000 per violation; the Ordinance imposes such penalties up to the amount of $50,000. (Fin. Code, § 4977, subd. (b); Oak. Mun. Code, § 5.33.080(D).) Under Division 1.6, the amounts collected from such civil penalties are to be used by the "licensing agency, subject to appropriation by the Legislature, for the purposes of education and enforcement in connection with abusive lending practices." (Fin. Code, § 4977, subd. (g).) The amounts collected by the Ordinance presumably simply go into the city coffers. Punitive damages are available under Division 1.6 "upon a finding that such damages are warranted pursuant to Section 3294 of the Civil Code" (Fin. Code, § 4978, subd. (b) (2), which requires "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice" (Civ. Code, § 3294, subd. (a)); the Ordinance allows punitive damages "if the court determines by clear and convincing evidence that the lender has shown reckless disregard for the

rights of the borrower." (Oak. Mun. Code, § 5.33.080(A)(5).) Division 1.6 provides that nothing in section 4978, which addresses civil liability, "is intended, nor shall be construed, to abrogate existing common law provisions prohibiting double recovery of damages." (Fin. Code, § 4978, subd. (c).) The Ordinance, however, expressly notes its remedies "are cumulative. The protections and remedies provided under this chapter are in addition to other protections and remedies that may be otherwise available under law. Nothing in this chapter is intended to limit the rights of any injured person to recover damages or pursue any other legal or equitable action under any other applicable law or legal theory." (Oak. Mun. Code, § 5.33.080(E).)

We now turn to the question of whether these similarities and differences may coexist or, if instead, the Ordinance is preempted by Division 1.6.

## B. *Analysis*

■ "Under article XI, section 7 of the California Constitution, '[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.' " (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897 [16 Cal.Rptr.2d 215, 844 P.2d 534] (*Sherwin-Williams*).) In addition, charter cities such as Oakland may adopt and enforce ordinances that conflict with general state laws, provided the subject of the regulation is a "municipal affair" rather than one of "statewide concern." (Cal. Const., art. XI, § 5;[9] Oak. City Charter, § 106; see *Johnson v. Bradley* (1992) 4 Cal.4th 389, 399 [14 Cal.Rptr.2d 470, 841 P.2d 990].) Here, however, the City reasonably concedes regulation of predatory practices in mortgage lending is one of statewide concern. Under these circumstances, the parties agree that if the Ordinance conflicts with state law, it is preempted.

■ A conflict between state law and an ordinance exists if the ordinance duplicates or is coextensive therewith, is contradictory or inimical thereto, or enters an area either expressly or impliedly fully occupied by general law. (*Sherwin-Williams, supra,* 4 Cal.4th at pp. 897–898.) Relying solely on the Legislature's failure to include express preemption language and the unique local interests of Oakland, the City contends that Division 1.6 sets only "statewide minimum standards, not statewide uniform standards, for subprime

---

[9] California Constitution, article XI, section 5, subdivision (a) provides: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."

home mortgage lending." We conclude that in enacting Division 1.6 the Legislature has impliedly fully occupied the field of regulation of predatory practices in home mortgage lending, and hence the Ordinance is preempted on this ground.

    ■  "[I]t is well settled that local regulation is invalid if it attempts to impose additional requirements in a field which is fully occupied by statute." (*Tolman v. Underhill* (1952) 39 Cal.2d 708, 712 [249 P.2d 280] (*Tolman*).) "[L]ocal legislation enters an area that is 'fully occupied' by general law when the Legislature has expressly manifested its intent to 'fully occupy' the area [citation], or when it has impliedly done so in light of one of the following indicia of intent: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality [citations]." (*Sherwin-Williams, supra,* 4 Cal.4th at p. 898.)

    Here, of course, there is no express preemption language in Division 1.6. However, there are clear indications of the Legislature's implicit intent to fully occupy the field of regulation of predatory lending tactics in home mortgages.

    ■  "Where the Legislature has adopted statutes governing a particular subject matter, its intent with regard to occupying the field to the exclusion of all local regulation is not to be measured alone by the language used but by the whole purpose and scope of the legislative scheme." (*Tolman, supra,* 39 Cal.2d at p. 712; *Wilson v. Beville* (1957) 47 Cal.2d 852, 859 [306 P.2d 789] (*Wilson*) [same]; see *In re Lane* (1962) 58 Cal.2d 99, 102–103 [22 Cal.Rptr. 857, 372 P.2d 897] (*Lane*).) "State regulation of a subject may be so complete and detailed as to indicate an intent to preclude local regulation. [Citations.] In this connection it may be significant that the subject is one which . . . requires uniform treatment throughout the state." (*Chavez v. Sargent* (1959) 52 Cal.2d 162, 177 [339 P.2d 801] (*Chavez*), disapproved on other grounds in *Petri Cleaners, Inc. v. Automotive Employees, etc., Local No. 88* (1960) 53 Cal.2d 455, 474–475 [2 Cal.Rptr. 470, 349 P.2d 76].)

    ■  "The denial of power to a local body when the state has preempted the field is not based solely upon the superior authority of the state. It is a rule of necessity, based upon the need to prevent dual regulations that could result in uncertainty and confusion. Thus, the term 'conflict' as used in

section 11 of article XI has been held not to be limited to a mere conflict in language, but applies equally to a conflict of jurisdiction." (*Abbott v. City of Los Angeles* (1960) 53 Cal.2d 674, 682 [3 Cal.Rptr. 158, 349 P.2d 974].) "Whenever the Legislature has seen fit to adopt a general scheme for the regulation of a particular subject, the entire control over whatever phases of the subject are covered by state legislation ceases as far as local legislation is concerned." (*Lane, supra,* 58 Cal.2d at p. 102; *id.* at p. 105 ["where the state has fully occupied the field, there is no room for additional requirements by local legislation"]; *Wilson, supra,* 47 Cal.2d at p. 859 ["general rule that charter provisions cannot control in matters of statewide concern where the state has occupied the field"].) "Where a statute and an ordinance are identical it is obvious that the field sought to be covered by the ordinance has already been occupied by state legislation." (*Pipoly v. Benson* (1942) 20 Cal.2d 366, 371 [125 P.2d 482].)

Thus, in *Wilson, supra,* 47 Cal.2d at page 856, we held that a person seeking compensation for a municipal taking does not lose his claim by failing to file it with the city as required by the city charter. We observed the "exercise of the power of eminent domain is a matter of statewide concern." (*Id.* at p. 859.) "The Legislature has provided a complete and detailed system for exercising the right of eminent domain and assessing compensation," such that charter provisions making more onerous the recovery of compensation were invalid. (*Id.* at pp. 859–861; *id.* at p. 860 [*"The Legislature has fully occupied the field of eminent domain"*].) "If the city may enact such legislation or charter provisions the land owner is denied equal protection of the laws for the state statute would fix the limitation where the condemnor was a public utility but a different one would prevail where the condemnor was a municipal corporation. There is no distinction between such condemnors. The city along with public utilities are made equally liable by the Constitution." (*Id.* at p. 861.)

Similarly, in *Eastlick v. City of Los Angeles* (1947) 29 Cal.2d 661, 665 [177 P.2d 558] (*Eastlick*), the plaintiff's claim in a personal injury action based on state law "concededly was complete as measured by the requirements of the state law." However, the city argued judgment in the plaintiff's favor should be reversed because of her failure to itemize the damages in her claim as required by the city charter. (*Id.* at pp. 664–665.) We held that the Legislature had provided "a general scheme for the presentation of such liability claims to be effective throughout the state. . . . [W]ith respect to the subjects covered, the [state] statute occupies the entire field and it impliedly precludes control to that extent by municipal or local regulation." (*Id.* at p. 666.) A municipality "may not impose more onerous conditions affecting any other matter covered by the statute, such as the contents of the claim." (*Id.* at p. 667.) "[T]he provisions of that statute 'are exclusive' in regulating the presentation of claims arising under the Public Liability Act, and no city

charter provisions relating to the presentation of claims, whether adopted before or after the effective date of the statute, are applicable within the field covered thereby." (*Id.* at p. 668.)

Likewise in *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 152 [130 Cal.Rptr. 465, 550 P.2d 1001], we held that a charter city's "requirement that landlords obtain certificates of eviction before seeking repossession of rent-controlled units cannot stand in the face of state statutes that fully occupy the field of landlord's possessory remedies." We observed that requiring "landlords to fulfill the elaborate prerequisites for the issuance of a certificate of eviction by the rent control board before they commence the [state] statutory proceeding would nullify the intended summary nature of the remedy." (*Id.* at p. 151.) Citing *Wilson, supra,* 47 Cal.2d 852, and *Eastlick, supra,* 29 Cal.2d 661, we also noted that "[c]ity charter provisions purporting to impose far less burdensome prerequisites upon the exercise of statutory remedies have been held to be invalid invasions of the field fully occupied by the statute." (*Birkenfeld,* at p. 152; see *Healy v. Industrial Acc. Com.* (1953) 41 Cal.2d 118, 122 [258 P.2d 1] [If "there is any conflict between charter provisions and the compensation sections of the Labor Code, the latter must prevail. Under power expressly granted to it by the Constitution, the Legislature has established a complete system of workmen's compensation which obviously is a subject of state-wide concern, and it is well settled that in such matters the general law is paramount"]; *Lane, supra,* 58 Cal.2d at pp. 103–105 ["city ordinance attempting to make sexual intercourse between persons not married to each other criminal is in conflict with the state law and is void" given the "Penal Code sections covering the criminal aspects of sexual activity are so extensive in their scope that they clearly show an intention by the Legislature to adopt a general scheme for the regulation of this subject," and "although living in a state of cohabitation and adultery is prohibited [citation], neither simple fornication or adultery alone nor living in a state of cohabitation and fornication has been made a crime in this state"]; *Isaac v. City of Los Angeles* (1998) 66 Cal.App.4th 586, 599 [77 Cal.Rptr.2d 752] (*Issac*) [ordinance giving a utility lien priority over other recorded liens invalid "because it disrupts California's statewide statutory scheme of lien priority"]; *id.* at p. 600 ["lien priorities on real property a matter of statewide concern because statewide uniformity in lien priority is essential"].)

Like the statutory schemes considered in *Wilson, Eastlick,* and *Birkenfeld,* Division 1.6 comprehensively regulates predatory lending practices in home mortgages. It delineates at length what mortgages are covered, what lending acts are prohibited, who can be held liable for violations of Division 1.6, the various enforcement mechanisms available, who may invoke such enforcement mechanisms, and defenses to such violations. The provisions of Division 1.6 "are so extensive in their scope that they clearly show an intention

by the Legislature to adopt a general scheme for the regulation of" predatory lending tactics in home mortgages. (*Lane, supra,* 58 Cal.2d at p. 103.)

Moreover, in regulating such lending tactics in home mortgages, the Legislature was not suddenly entering an area previously governed by municipalities and unexplored at a statewide level. To the contrary, as the City acknowledges, regulation of mortgage lenders has historically occurred at the state, not the municipal, level. (See, e.g., Fin. Code, §§ 5000 et seq. [Savings Association Law], 50000 et seq. [California Residential Mortgage Lending Act]; Civ. Code, §§ 2947–2955.5 [mortgage of real property provisions].) In determining whether the Legislature intended to occupy the field of regulation of predatory home mortgage lending, we consider this historical role, and view Division 1.6 not in isolation, but as part of an overall legislative scheme addressing mortgage lending. As the Legislative Counsel's Digest to Division 1.6 notes, "Existing law provides for regulation of banks and savings associations by the Department of Financial Institutions. Existing law provides for regulation of real estate brokers by the Department of Real Estate. Existing law provides for regulation of finance lenders and residential mortgage lenders by the Department of Corporations. Existing law provides that willful violations of provisions governing savings associations, real estate brokers, and residential mortgage lenders are crimes. [¶] This bill would impose various requirements on consumer loans secured by specified real property, defined as 'covered loans.' " (Stats. 2001, ch. 732.)

Indeed, when asked at oral argument, the City could point to no other instance in over 150 years of state history where a municipality had attempted to regulate mortgage lending. Thus, state activity in the area of regulation of mortgage lending was not only historically dominant, it was exclusive. (Cf. *United States v. Locke* (2000) 529 U.S. 89, 108 [146 L.Ed.2d 69, 120 S.Ct. 1135] [finding no presumption against federal preemption regarding regulation of maritime commerce]; compare *Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 974 [17 Cal.Rptr.3d 180, 95 P.3d 422] [strong presumption against federal preemption of state wine label regulation given that state activity in this area historically extensive and dominant].) Thus, mortgage lending is unlike the area of gun control law, on which the City and the dissent rely, in which courts have concluded that the Legislature has chosen to legislate narrowly, and "rather than intending to deprive municipalities of their police power to regulate handgun sales, . . . has been cautious about depriving local municipalities of aspects of their constitutional police power to deal with local conditions." (*California Rifle & Pistol Assn., Inc. v. City of West Hollywood* (1998) 66 Cal.App.4th 1302, 1318 [78 Cal.Rptr.2d 591]; see *Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853, 865, 866 [118 Cal.Rptr.2d 746, 44 P.3d 120] (*Great Western*) [noting state

laws regulating gun shows expressly refer to applicable local laws]; dis. opn., *post*, at pp. 1267, 1272.) As one amicus curiae notes, the City does not demonstrate that in the area of regulating residential mortgages, the Legislature has attempted "to tread lightly on a narrow path."

Moreover, it is beyond peradventure that effective regulation of mortgage lending, and in particular here abusive practices in such lending, "requires uniform treatment throughout the state." (*Chavez, supra,* 52 Cal.2d at p. 177; see *Northern Cal. Psychiatric Society v. City of Berkeley* (1986) 178 Cal.App.3d 90, 101 [223 Cal.Rptr. 609] [" 'Certain areas of human behavior command statewide uniformity, especially the regulation of statewide commercial activities' "].) California's housing market is one of its most critical, and securities based on home loans in this market are sold not only on a statewide, but on a national level. (Eggert, *Held Up in Due Course: Predatory Lending, Securitization, and the Holder in Due Course Doctrine* (2002) 35 Creighton L. Rev. 503, 536 ["Through securitization, the source of capital for mortgage funding has been transferred from the savings industry, which used deposits to fund loans, to the capital markets and the portfolios of institutional investors"].) Commercial reality today would confound any effective regulation of mortgage lending based on potentially hundreds of competing and inconsistent measures at the local level. Rather, centralized command over such mortgage lending practices provides an essential "regulatory lever." (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 23 [283 Cal.Rptr. 569, 812 P.2d 916] (*Calif. Fed.*).)

■ We therefore conclude that through the enactment of Division 1.6, the Legislature has fully occupied the field of regulation of predatory tactics in home mortgages. While in other cases the determination of whether the state and local laws occupy the same "field" may be somewhat nuanced, little is left to the imagination of even the most casual reader here. Both Division 1.6 and the Ordinance regulate predatory lending tactics in home mortgages, and do so in parallel fashion. The Ordinance, like Division 1.6, addresses at length what mortgages are covered, what lending acts are prohibited, who can be held liable for violations of the Ordinance, the various enforcement mechanisms available, who may invoke such enforcement mechanisms, and defenses to such violations. As previously observed, it is undisputed the Ordinance applies to at least all home loans covered by Division 1.6. Moreover, the Ordinance regulates many of the same predatory practices addressed by Division 1.6, and prevalent in subprime lending, such as excessive prepayment fees, making loans without any reasonable expectation they can be repaid, refinancing with no benefit to the borrower, encouraging default on an existing loan in connection with refinancing that loan, financing unnecessary products such as credit insurance, unfairly accelerating indebtedness, and financing excessive points and fees. Thus, the Ordinance is not

supplementary legislation that in other contexts might be allowed, but a line-item veto of those policy decisions by the Legislature with which the City disagrees. In revisiting this area fully occupied by state law, the Ordinance undermines the considered judgments and choices of the Legislature, and is therefore preempted.

In drafting Division 1.6, the Legislature balanced two compelling and competing considerations, i.e., the need to protect particularly vulnerable consumers from predatory lending practices and the concern that homeowners not be unduly hindered in accessing the equity in their own homes. (See, e.g., Sen. Judiciary Com., Analysis of Assem. Bill No. 489 (2001–2002 Reg. Sess.) as amended June 21, 2001, p. 2 ["Although many subprime lenders offer a vital service to some low-income borrowers who would not otherwise qualify for credit, many other low-income borrowers have been victimized by improper practices . . . referred to . . . as 'predatory practices' "]; Assem. Republican Bill Analysis, Analysis of Assem. Bill No. 489 (2001–2002 Reg. Sess.) as amended Sept. 6, 2001, p. 3 [noting federal regulators "believe that responsible sub-prime lending can expand credit access for consumers," and that " 'a practice that can be abusive in some contexts can also-in [the] absence of fraud or deception-be highly beneficial to consumers . . . . Well meaning but haphazard reactions on the part of the regulators . . . may have the unintended consequence of hurting those whom we intend to help' "]; Assem. Com. on Appropriations, Analysis of Assem. Bill No. 489 (2001–2002 Reg. Sess.) as amended May 1, 2001, p. 2 ["The cycle of high-cost loan refinancing can ultimately deplete the homeowner's equity and result in foreclosure"].) While destructive lending practices occur most often in connection with subprime lending, such lending is not inherently abusive, and has enabled an entire class of individuals with impaired credit to enter the housing market or access the equity in their homes. (See U.S. Gov. Accounting Off., Rep. on Federal and State Agencies Face Challenges in Combating Predatory Lending, testimony of David G. Wood before Sen. Special Com. on Aging (Feb. 24, 2004) p. 4.) Severe regulation of subprime lending might cause lenders to cease making such loans in California, or preclude borrowers from obtaining a loan based on equity in their home even though such loans can serve a legitimate need. (Cal. Dept. of Real Estate, Enrolled Bill Rep. on Assem. Bill No. 489 (2001–2002 Reg. Sess.) Sept. 27, 2001, p. 7.) Moreover, increased regulation generally entails additional cost, decreasing further the availability of loan funds to subprime borrowers. Thus, the Legislature was aware regulation of certain predatory practices in mortgage lending, practices which occur most often in the subprime market, could have the unintended consequence of hurting those the legislation was intended to help, and sought to balance these competing concerns. The Ordinance, and the possibility of other divergent and competing local measures

throughout California, upsets that balance. By analogy to federal preemption law, the Ordinance " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' " of the Legislature. (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 477 [103 L.Ed.2d 488, 109 S.Ct. 1248].)

■ Taking just one example, Division 1.6 expressly does "not impose liability on an assignee that is a holder in due course" and the provisions of the division do not apply to "persons chartered by Congress to engage in secondary mortgage market transactions." (Fin. Code, § 4979.8.) The Ordinance expressly imposes such liability. (Oak. Mun. Code, § 5.33.070.) Such an extension of liability to "[a]ny person who purchases or is otherwise assigned a home loan" (*ibid.*) may result in secondary purchasers being hesitant or unwilling to purchase mortgages originating in Oakland. Should other cities adopt a similar extension of liability,[10] subprime lending could conceivably be sharply curtailed in the state, despite the Legislature's efforts to avoid such an event. As AFSA observes, the Ordinance "not only contradicts a careful legislative choice, [it] threatens to disrupt secondary market transactions, interrupting the flow of loan capital to this state," and "divide the state's economy into tiny geographic markets."

■ Thus, contrary to the City's and the dissent's assertion, Division 1.6 does not set "statewide minimum" standards beyond which municipalities are free to regulate. (Dis. opn., *post*, at p. 1271; *id.* at p. 1275.) Rather, the Legislature's full occupation of this field preempts the Ordinance's regulation even of those mortgages not addressed by Division 1.6, such as loans between $250,000 and $359,650. For the reasons cited above, it is difficult to imagine how the state could maintain a centralized and uniform command in regulating predatory tactics in home mortgages if municipalities were free to regulate the area with respect to loans in amounts in excess of the state statutory ceiling.

Thus, in *Lane* we held that a city ordinance, making criminal sexual conduct the state Penal Code did not, was preempted because the state had fully occupied the field of regulation of sexual conduct by enacting a detailed legislative scheme. (*Lane, supra,* 58 Cal.2d at pp. 103–105; see *Issac, supra,* 66 Cal.App.4th at p. 601 ["absence of any specific statewide legislation . . . does not create a statutory loophole inviting local legislation, because of the pervasive statutory scheme already in place governing lien priority"].) Similarly here, the Legislature's decision that certain mortgages, such as loans in

---

[10] Los Angeles has already done so in its antipredatory loan ordinance, added January 29, 2003. (L.A. Mun. Code, ch. XVIII, art. 1, § 181.07, subd. (B) ["Any person who purchases or is otherwise assigned a High-Cost Refinance Home Loan is subject to all claims, actions, and defenses related to that High-Cost Refinance Home Loan that the Borrower could assert against the original Lender"].)

excess of $250,000, are not subject to regulation under Division 1.6 must be respected, and is not an invitation for municipal regulation. The Legislature may reasonably have concluded that mortgages in excess of the statutory ceiling were less likely to be attended by the predatory practices that it sought to curtail, and hence borrowers should have greater freedom to contract in this area. (See U.S. Dept. of the Treasury & U.S. Dept. of Housing and Urban Development, Joint Rep., Curbing Predatory Home Mortgage Lending, *supra*, p. 28 [noting on average subprime loans are smaller than prime loans].) As one amicus curiae notes, "California's housing market is one of the most vital sectors of its economy. The balances struck by the Legislature in this critical area therefore must be seen as a reflection of the Legislature's reasoned assessment of the competing needs to provide mortgage capital to the broadest possible segment of the populace while, at the same time, discouraging unfair lending practices throughout the state. Local governments should not be free to undermine the Legislature's efforts in this area . . . by striking different policy balances of their own."

The City and the dissent essentially assert, however, that Oakland has a higher incidence of subprime lending and the predatory tactics associated with such lending than other areas of the state, and hence may suffer more than other parts of California the resulting blight and poverty such tactics can foster. (Dis. opn., *post*, at pp. 1268–1271, 1275.) Assuming this is correct, and while these would be important local concerns, they do not give the City a license to regulate a highly complex financial area comprehensively addressed by state law. Such an approach would mean that any city which claimed to experience a disproportionate number of foreclosures, or instances of securities fraud, could simply write its own measures regardless of any confusion these competing measures may foster. Rather, the state's interest in uniformity in the area of mortgage lending law demonstrably transcends the concerns of a particular municipality, and is a "convincing basis for legislative action . . . based on sensible, pragmatic considerations." (*Calif. Fed.*, *supra*, 54 Cal.3d at p. 18.) In this situation, the City must "defer to legislative estimates regarding the significance of a given problem and the responsive measures that should be taken toward its resolution." (*Id.* at p. 24.)

The City relies on certain language in *Sherwin-Williams*, *supra*, 4 Cal.4th at page 904, taken out of context, to support its argument that the failure on the part of the Legislature to include express preemption language means that it had no implied intent to preempt. In *Sherwin-Williams*, there existed at all relevant times a statute that provided, " 'Nothing in this code shall invalidate an ordinance of, nor be construed to prohibit the adoption of an ordinance by, a city, city and county, or county, if such ordinance regulates the sale of aerosol containers of paint or other liquid substances capable of defacing property.' " (*Sherwin-Williams*, at p. 899, quoting former Pen. Code, § 594.5.)

We observed that former Penal Code section 594.1, the statute at issue, as originally enacted in 1981, had regulated aerosol paint containers larger than six ounces in section 1, an express preemption provision regarding sales and possession of such aerosol containers in section 2, and a no reimbursement provision in section 3. (*Sherwin-Williams*, at p. 900.) In 1988, former Penal Code section 594.1 was amended such that it generally applied to all aerosol paint containers in section 1, and had a no reimbursement provision in section 2. No express preemption provision was included in the 1988 amendment. (*Sherwin-Williams*, at pp. 900–901.)

We found that the amended section 594.1 of the Penal Code did not preempt a local ordinance governing the display of aerosol paint containers and marker pens. (*Sherwin-Williams, supra*, 4 Cal.4th at pp. 895–896, 906.) In so doing, we made the following statement, on which the City relies: "In both 1981 and 1988, the Legislature was acting, and presumably knew that it was acting, in the context of Penal Code section 594.5, which by its very terms would render any aerosol paint legislation 'non-preemptive,' at least as to sales. Hence, in both years, it was obligated, and presumably knew that it was obligated, to take affirmative steps if it intended to preempt. In 1981, it took such steps: it included the preemption declaration. In 1988, it did nothing. It certainly knew how to copy: in the earlier year, it inserted a 'no reimbursement' clause; in the later, it inserted a similar clause. To our mind, the conclusion is clear. In 1981, it expressly intended to preempt. In 1988, it impliedly intended not to." (*Sherwin-Williams*, at p. 904.)

As can be seen, *Sherwin-Williams* was decided based on a significantly different statutory landscape than we encounter here. Unlike *Sherwin-Williams*, the City points to no language in Division 1.6 which states that nothing in its provisions shall invalidate a local ordinance if such ordinance regulates predatory mortgage lending practices. Hence, the Legislature's failure to include an express preemption provision in Division 1.6 does not ineluctably mean there is no implied preemption. Significantly, aside from the Savings Association Law (Fin. Code, § 5000 et seq.), at least two other state laws governing mortgage lenders, the California Residential Mortgage Lending Act (Fin. Code, § 50000 et seq.), and the mortgage of real property provisions in the Civil Code (Civ. Code, §§ 2947–2955.5), do not have an express preemption provision. Indeed, the City does not point out for us any state mortgage lending law that has an express preemption provision.

The City and the dissent rely on testimony at a Senate subcommittee hearing held shortly before the passage of Division 1.6, urging inclusion of an express preemption provision, and the fact that several members of the Legislature had a brief conversation regarding preemption at that subcommittee hearing, in asserting Division 1.6 does not impliedly preempt the Ordinance. (Dis. opn., *post*, at pp. 1266–1267.)

██ Of course, by definition, the Legislature's implicit full occupation of a field occurs only when there is no express *intent in the state law*. We disagree with the Court of Appeal's statement that "when the Legislature is silent on preemption, courts presume there is *no* intent to preempt." Adopting this approach would be a notable departure from our implied preemption precedents. ██ Instead, in such circumstances we consider factors including the language and scope of the adopted measure, the history behind the adopted measure, and the history of regulation in the area, as we have done in this and other field preemption cases. (E.g., *Great Western, supra,* 27 Cal.4th at pp. 860–867; *Tolman, supra,* 39 Cal.2d at p. 712 [Legislature's "intent with regard to occupying the field to the exclusion of all local regulation is not to be measured alone by the language used but by the whole purpose and scope of the legislative scheme"].) Neither the City nor the dissent offers a reason why we would not consider such language, scope, and purpose merely because at some point during the bill enactment process the issue of express preemption may have arisen. Nor do they demonstrate that these traditional indicators of legislative intent point toward allowing hundreds of cities in California to enact their own mortgage lending laws, an area historically regulated by the state.

Taken to its logical extreme, the City's and the dissent's approach would eliminate the doctrine of implied preemption at least to the extent someone somewhere ever suggested to the Legislature an express preemption clause would be useful, and the Legislature declined to adopt that suggestion. Such a standard would be easily manipulable, and would punish constituents who attempt to educate the Legislature about their concerns to the extent their concerns were not addressed in the precise manner proposed to the Legislature. Moreover, for well over a century, mortgage lending has occurred at the state, not municipal level, and the effects of such regulation are no longer simply statewide, but national. While we cannot know the reasons for the absence of express preemption language, the Legislature is deemed to be aware of existing law, and may have comfortably assumed that given such state dominance in mortgage lending regulation, and having omitted express preemption provisions in other mortgage lending laws without such an omission being read as a license for local regulation, that an express preemption provision was unnecessary. Indeed, unlike the dissent, we are reluctant to reward the opponents of preemption when nothing in the statutory language or history suggests they persuaded the Legislature to consider relinquishing its historical control of this particular regulatory field and to tolerate municipal, and possibly conflicting, regulation.

██ In addition, our prior cases establish that even when the Legislature amends a bill to add a provision, and then deletes that provision in a subsequent version of the bill, this failure to enact the provision is of little

assistance in determining the intent of the Legislature. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 573, fn. 5 [21 Cal.Rptr.3d 31, 21 Cal.Rptr.3d 331] [" 'Unpassed bills, as evidence of legislative intent, have little value' "]; *People v. Sparks* (2002) 28 Cal.4th 71, 87, fn. 20 [120 Cal.Rptr.2d 508, 47 P.3d 289] [same]; *Sherwin-Williams, supra,* 4 Cal.4th at p. 904, fn. 6 [same].) How much less value is there in determining legislative intent when no version of a bill was ever amended to include a provision, here express preemption, suggested by a member of the public? Similarly, we have repeatedly observed that "statements of an individual legislator, including the author of a bill, are generally not considered in construing a statute, as the court's task is to ascertain the intent of the Legislature as a whole in adopting a piece of legislation." (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062 [48 Cal.Rptr.2d 1, 906 P.2d 1057].)[11]

Moreover, while the possibility of including express preemption language may have arisen at one committee hearing, and in certain letters from constituents,[12] it is scarcely mentioned in the remainder of Division 1.6's

---

[11] The dissent bases much of its position on a "concession" by AFSA that " 'the Legislature could say nothing for or against preemption *without risking defeat* of' " Assembly Bill No. 489. (Dis. opn., *post,* at p. 1266; *id.* at p. 1267.) The dissent points to no evidence AFSA was involved in the legislative process of Division 1.6 even as an interested constituent. More critically, we have repeatedly concluded, as noted above, that even the statements of individual legislators are not generally considered in construing a statute. Of how much less worth is a third party's opinion regarding that legislative process? Indeed, discerning legislative intent from an outside party's "concession" appears not only a novel but a problematic approach. Had AFSA not made such a "concession," would the dissent then find there was preemption? As in the case of comments from constituents to the Legislature, on which the dissent also relies, our preemption principles simply cannot be so arbitrary and malleable.

Even if there was competent evidence the Legislature had debated and rejected the notion of including an express preemption clause, and deliberately decided to remain silent, such history would merely show that lawmakers left the preemption issue exactly where it would have been if nothing had been said during the bill enactment process. Under such circumstances, and contrary to what the dissent claims, there would still be no basis for straying from our traditional examination of the language, scope, and purpose of the enacted statutory scheme in determining whether the Legislature manifested an implicit intent to occupy the field and preempt all local regulation. Considering that language, scope, and purpose here, as delineated at length above, we find clear indications of such an intent, and conclude the Ordinance is preempted.

[12] It is noteworthy that one such letter writer, FannieMae, expressly *withdrew* its opposition to Assembly Bill No. 489, and *then* urged the bill authors to consider adding an express preemption provision. (FannieMae, letter to Sen. Machado and Assemblywoman Migden (Sept. 13, 2001) p. 1.) Similarly, the California Mortgage Bankers Association noted it had withdrawn its opposition to Assembly Bill No. 489, was now neutral on both Assembly Bill Nos. 489 and 344, and *then* mentioned it looked forward to working with the Legislature on an express preemption provision. (Cal. Mortgage Bankers Assn., letter to Sen. Machado and Assemblywoman Migden (Oct. 4, 2001) p. 1.)

legislative history. Rather, in that history, the Legislature was instead focused on what the terms of the antipredatory lending law should be, which, as we have concluded, is its role in this area. Thus, in various bill analyses recounting bases for opposition to Assembly Bill No. 489 and in letters from Assembly Republican Leader Dave Cox and Senate Republican Whip Raymond Haynes to Governor Davis urging a veto of that bill, there is no mention of the absence of an express preemption provision. (See, e.g., Assem. Republican Caucus, Analysis of Assem. Bill No. 489 as amended Sept. 6, 2001, p. 2; Assem. Republican Caucus, Analysis of Assem. Bill No. 489 as amended Apr. 5, 2001, pp. 1–2; Assemblyman Dave Cox, letter to Governor Gray Davis (Sept. 25, 2001) p. 1; Sen. Raymond Haynes, letter to Governor Gray Davis (Sept. 18, 2001) p. 1.)

Similarly, in recounting the opposition arguments to Assembly Bill Nos. 489 and 344 (the cleanup bill for Assembly Bill No. 489), the enrolled bill reports for the State and Consumer Services Agency, the Department of Real Estate, and the Department of Financial Institutions do not mention the absence of an express preemption provision. Thus, the Department of Real Estate enrolled bill report states, "[s]ome lenders may leave the California market limiting access to capital for those who need it most. In addition, this bill would effectively preclude equity based lending for covered loans even though it has been demonstrated such loans have served a legitimate need." (Dept. of Real Estate, Enrolled Bill Rep. on Assem. Bill No. 489, Sept. 27, 2001, p. 7.) Under "[v]otes," the enrolled bill report notes, "[m]any [m]embers who voted 'no' expressed concerns that the passage of the bill would cause lenders to cease making subprime loans in California. In addition, many [m]embers who voted 'no' expressed concern that this bill would preclude a borrower from obtaining a loan solely based on the equity in the property, even though such loans may serve a legitimate need." (*Ibid.*; State and Consumer Services Agency, Enrolled Bill Rep. on Assem. Bill No. 489, Sept. 20, 2001, p. 7 ["Could eliminate a source of funding for a segment of consumers that are not served by traditional, mainstream lenders (the same argument that is applied to payday loans). Could make California loans undesirable for purchase and investment. Bankers argue that legitimate lenders that charge higher fees and interest rates to people with poor credit to compensate for the greater risk of default (known as subprime lending) will be unfairly restricted"]; Dept of Financial Inst., Enrolled Bill Rep. on Assem. Bill No. 489, Sept. 27, 2001, p. 8 ["[T]here is some concern as to the [e]ffect the provisions of this bill will have on the subprime market. As illustrated by the departure of some licensees in North Carolina, some lenders may leave California's lending market. The effect on the subprime market could be the reduction of mortgage credit available to higher risk borrowers who do not

otherwise qualify in the prime market"]; Dept. of Real Estate, Enrolled Bill Rep. on Assem. Bill No. 344, Sept. 27, 2001, pp. 2, 4.) The Department of Corporations enrolled bill report did note among other arguments in opposition to Assembly Bill No. 489 that "[i]ndustry groups argue that AB 489 should expressly preempt local ordinances which exceed the protections afforded by this bill. Without preempting city or county ordinances, lenders will continue to be exposed to nonuniform restrictions imposed by various municipalities throughout California." (Dept. of Corporations, Enrolled Bill Rep. on Assem. Bill No. 489, Sep. 27, 2001, p. 8.) However, this restatement of an argument made by certain industry groups does not purport to reflect debate within the Legislature.[13]

The Court of Appeal also noted that the Governor in signing Assembly Bill No. 489 expressly lamented the fact it did not contain express preemption language, and the Legislative Counsel opined a local ordinance would be valid to the extent it did not conflict with state law. We may not consider such postenactment events as a Governor's signing statement, and not even the City relies on this circumstance. Moreover, the Legislative Counsel's generalized and routine discussion of preemption law is not evidence the Legislature believed an ordinance such as the one challenged here would survive a preemption challenge. The Legislative Counsel expressly observed, "Because we have not been provided with a specific local government ordinance regulating high-cost mortgage lending, we . . . discuss generally the grounds for preemption of a local government ordinance by state law." (Deputy Legis. Counsel L. Erik Lange, letter to Sen. Machado (Sept. 7, 2001) p. 1.)

AFSA also claims that the Ordinance is preempted by Division 1.6 because it duplicates and contradicts state law and the Ordinance is preempted by Civil Code section 1916.12. Since we conclude the Ordinance is preempted because by enacting Division 1.6 the Legislature has fully occupied the field

---

[13] Other than the statements of individual legislators at one Senate subcommittee hearing, and testimony by constituents at that same hearing, which we have already discussed, the dissent cites nothing in the legislative history of Division 1.6 to support its repeated assertion that the Legislature "consciously considered including express preemption language in the statewide statute . . . , but ultimately omitted any such language from the statute as one of the essential elements of a compromise that led to the enactment of the legislation." (Dis. opn., *post*, at p. 1265, fn. omitted; see, e.g., *ibid.* ["Here, there is considerable extrinsic evidence . . . that the Legislature specifically considered and purposefully rejected an express preemption clause despite extensive lobbying for the inclusion of express preemption language in the state statute"]; *id.* at p. 1266 ["the issue of preemption was arguably at the forefront of the debate over Assembly Bill No. 489"]; *id.* at p. 1267 ["silence on the preemption issue was not inadvertent but deliberate, part of a legislative compromise"]; *ibid.* ["passage of the bill hinged on the inclusion or exclusion of express preemption language"]; *id.* at p. 1271 ["All we can be certain of is that Division 1.6 was the product of a legislative compromise, and that the compromise included deliberate silence on the matter of preemption"].)

of regulation of predatory practices in home loans, we need not address these additional preemption arguments.

DISPOSITION

The judgment of the Court of Appeal is reversed, and the case remanded to that court for further proceedings consistent with this opinion.

Baxter, J., Werdegar, J., and Chin, J., concurred.

**GEORGE, C. J.,** Dissenting.—I respectfully dissent.

Past California cases establish that a general statewide statute will be held to preempt all local legislative measures only when the state legislation, explicitly or impliedly, "clearly indicates" that the Legislature intended to fully occupy the field and preclude all local regulation. (*Sherwin-Wlliams Co. v. City of Los Angeles,* (1993) 4 Cal.4th 893, 898 [16 Cal.Rptr.2d 215, 844 P.2d 534].) Here, the Legislature consciously considered including express preemption language in the statewide statute (division 1.6 of the Financial Code, §§ 4970–4979.8),[1] but ultimately omitted any such language from the statute as one of the essential elements of a compromise that led to the enactment of the legislation. In view of this legislative background— which demonstrates that the statute does not "clearly indicate" a legislative intent to preempt all local legislation—and the distinctive local interest that the City of Oakland has in adopting stringent and effective measures to protect its residents from the predatory lending practices at issue, I cannot agree with the majority that Division 1.6 properly may be found to preempt the Ordinance in its entirety.[2]

I

Unlike our previous implied preemption cases, this is not simply a case in which the Legislature was silent about preemption. Here, there is considerable extrinsic evidence, and a concession from the party arguing in favor of preemption, that the Legislature specifically considered and purposefully rejected an express preemption clause despite extensive lobbying for the inclusion of express preemption language in the state statute. As plaintiff American Financial Services Association (AFSA) itself acknowledges, there

---

[1] For convenience, like the majority opinion, I shall refer to the relevant state statute as "Division 1.6," and the relevant local legislation as the "Ordinance."

[2] Because the majority concludes that the Ordinance is invalid in its entirety, I do not reach the question whether some individual provisions of the local enactment may be inconsistent with Division 1.6 and for that reason preempted by that legislation.

were strongly held disagreements over preemption between industry representatives and consumer proponents of the bill. Indeed, the record reveals that the subprime lending industry vigorously lobbied for express preemption language.

Under normal circumstances, the mere absence of express preemption language would not be dispositive. But here the party arguing in support of preemption explicitly has admitted that there were insufficient votes in the Legislature to enact the bill with an express preemption provision. Specifically, AFSA's brief acknowledges that "the Legislature could say nothing for or against preemption *without risking defeat* of [Assembly Bill No.] 489. So it elected to remain silent." (Italics added.) The majority fails to acknowledge or afford appropriate consideration to this admission.

Moreover, contrary to the majority's reading of the relevant legislative history, I believe this history supports AFSA's concession. This is not a situation where the preemption issue was abstract or peripheral. Indeed, the issue of preemption was arguably at the forefront of the debate over Assembly Bill No. 489 (2001–2002 Reg. Sess.) (Assembly Bill No. 489). For instance, the members of the Senate Banking Committee that forged the legislative compromise that led to passage of the bill heard testimony from Oakland City Councilman Ignacio de la Fuente regarding the imminent passage of the Ordinance. In response to this testimony, a committee member expressed concern that without express preemption language, there would be a host of different lending policies from community to community. In response, the bill's co-author, Assemblywoman Migden, stated at the August 27, 2001, hearing on Assembly Bill No. 489 by the Senate Banking, Commerce and International Trade Committee: "We're trying to make sure that everyone can live with the bill, industry and consumers alike and . . . we've decided . . . to be silent on [preemption], which does lend different interpretations."

At the same hearing, the committee also heard from numerous financial industry representatives who urged the committee to include preemption language. (Adam Bass of Ameriquest Mortgage Company: "preemption is a major issue"; John Ross, Mortgage Bankers Assn.: "preemption is a big issue for our members"; Brian Kennealy of the Responsible Mortgage Lenders Coalition: "preemption is a very, very important issue to us and our members"; Eleanda Delgado of Irwin Home Equity Corp., agreeing with the others; Bernard Nevins, Cal. Assn. of Industrial Bankers: preemption "can't hurt and it would be very bad if you didn't do it"; Phil Eisenberg, American Internat. Group: "the preemption issue is fundamental. It's not cursory. It's not a medium-sized issue. It's fundamental"; Tom McMorrow, Countrywide Mortgage and First Union: "Preemption remains fundamental.") This effort by the financial industry to include express preemption language in the statute

further establishes that silence on the preemption issue was not inadvertent but deliberate, part of a legislative compromise "to make sure that everyone can live with this bill, industry and consumers alike . . . ." The majority's assertion that the Legislature's silence on preemption was inadvertent, or that the Legislature believed that express preemption language was unnecessary, is simply untenable.

The majority minimizes the foregoing history by arguing that although an express preemption issue "may have arisen" at some point during the bill enactment process, the issue was peripheral. As noted, this ignores AFSA's concession that the issue of express preemption not only "arose," but threatened to derail passage of the bill. Thus, this is not simply a case where "someone somewhere . . . suggested to the Legislature an express preemption clause would be useful, and the Legislature declined to adopt that suggestion." (Maj. opn., *ante*, at p. 1261.) This is a case where passage of the bill hinged on the inclusion or exclusion of express preemption language. Thus, this is not a case where the city relies on the mere absence of express preemption to argue against implied preemption. There is significantly more evidence of deliberate exclusion of a preemption provision here, and the majority's concern about the demise of the doctrine of implied preemption is unwarranted.

Nonetheless, it can be argued, as AFSA does, that the stalemate on the preemption issue neither supports nor undermines a conclusion as to preemption, and that the court should resort to certain default rules about preemption that it has developed over the years. But one of those rules, indeed the principal rule, is that legislative intent be clearly indicated. As the Court of Appeal noted in *California Rifle & Pistol Assn. v. City of West Hollywood* (1998) 66 Cal.App.4th 1302, 1317 [78 Cal.Rptr.2d 591], the Legislature's failure to include express preemption language may be critical. "Claims of implied preemption must be approached carefully, because they by definition involve situations in which there is no express preemption. Since preemption depends upon *legislative intent,* such a situation necessarily begs the question of why, if preemption was legislatively *intended,* the Legislature did not simply say so, as the Legislature has done many times in many circumstances." (*Ibid.*) Hence, the rule has developed that implied preemption properly can be found only when the circumstances "clearly indicate" a legislative intent to preempt. (*Sherwin-Wlliams Co. v. City of Los Angeles, supra,* 4 Cal.4th 893, 898.) The need for such a "clear indication" is especially acute when the extrinsic evidence and the concession of the parties demonstrate that the Legislature declined to adopt an express preemption provision because such a provision would not command a majority of the Legislature. A legislative stalemate on preemption is not an indication of a clear intent to preempt local legislation.

## II

The majority's emphasis on state uniformity and historical regulation patterns also fails to acknowledge properly the respect this court traditionally has accorded to localities regarding issues that have a unique local impact. As we stated in *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 707 [209 Cal.Rptr. 682, 693 P.2d 261], "[w]e will be reluctant to infer legislative intent to preempt a field covered by municipal regulation where there is a significant local interest to be served that may differ from one locality to another." I am particularly troubled by the majority's express disapproval of the Court of Appeal's contention that " 'when the Legislature is silent on preemption, courts presume there is *no* intent to preempt.' " (Maj. opn., *ante*, at p. 1261.) To the contrary, as the Court of Appeal aptly observed in *Gluck v. County of Los Angeles* (1979) 93 Cal.App.3d 121, 133 [155 Cal.Rptr. 435], the common thread of our preemption cases is that "if there is a significant local interest to be served from one locality to another then the presumption favors the validity of the local ordinance against an attack of state preemption."

The regulation of predatory lending undoubtedly is an area of statewide concern. Nevertheless, I am not persuaded that the field is *exclusively* so, thus leaving no room for local regulation. "The significant issue in determining whether local regulation should be permitted depends upon a 'balancing of two conflicting interests: (1) the needs of local governments to meet the special needs of their communities; and (2) the need for uniform state regulation.' . . . [¶] That basic issue, in turn, may in a specific instance be fragmented into the component issues which combine to effect its resolution such as whether local legislators are more aware of and better able to regulate appropriately the problems of their areas, whether substantial geographic, economic, ecological or other distinctions are persuasive of the need for local control, and whether local needs have been adequately recognized and comprehensively dealt with at the state level. Certain areas of human behavior command statewide uniformity, especially the regulation of state-wide commercial activities and the conduct of transient individuals, so that mobility may not be burdened unreasonably." (*Robins v. County of Los Angeles* (1966) 248 Cal.App.2d 1, 9 [56 Cal.Rptr. 853].)

As the court made clear in *Robins*, although the need for state uniformity is an important consideration in resolving preemption questions, the interests of the locality also are entitled to considerable weight. "The pervasive question to be answered is: Does the demand for uniformity throughout the state outweigh the needs of local governments to handle problems peculiar to their communities." (*Tri County Apartment Assn. v. City of Mountain View* (1988) 196 Cal.App.3d 1283, 1294 [242 Cal.Rptr. 438].)

The record in this case establishes that Oakland's Ordinance was adopted because many low-income homeowners in the City of Oakland were targeted by unethical mortgage lenders using predatory lending practices. Many low- and moderate-income homeowners in Oakland were unable to obtain conventional legitimate financing. Local conditions allowed predatory lenders to thrive, and their practices unfairly stripped homes of equity value and resulted in a number of unjust home foreclosures. Often, through fraudulent means, homeowners were charged exorbitant fees and interest rates and unfairly were persuaded to incur mortgage debt in excess of their needs or ability to pay. The record reflects that the Oakland City Council, in passing the ordinance in question, found that the predatory lending problem in Oakland was particularly aggravated "because of the high number of minority and low income homeowners in Oakland, and the pressures of gentrification in certain neighborhoods that increase property values and home equity," which have led to a situation in which "Oakland residents in low income areas have been perceived to be 'the house rich and the cash poor' and thus are prime targets for predatory lending practices."

Oakland's findings mirror the conclusions of the United States Department of Housing and Urban Development (HUD) in an analysis of almost one million mortgages reported nationwide in calendar year 1998 under the Home Mortgage Disclosure Act. (See HUD Rep., Unequal Burden: Income and Racial Disparities in Subprime Lending in America (Apr. 2000), http://www.hud.gov/library/bookshelf18/pressrel/subprime.html [as of Jan. 31, 2005] (HUD Report).) HUD's detailed analysis reached four critical conclusions: (1) from 1993 to 1998, the number of subprime refinance loans increased tenfold;[3] (2) subprime loans are three times more likely in low-income neighborhoods than in high-income neighborhoods; (3) subprime loans are five times more likely in African-American neighborhoods than in White neighborhoods; and (4) homeowners in high-income African-American neighborhoods are twice as likely as homeowners in low-income White

---

[3] The subprime mortgage market is a market providing credit access to borrowers who might not qualify for traditional financing, such as those with impaired credit, limited income, or high debt-to-income ratios.

HUD reports that in 1993, there were 80,000 subprime refinance loans reported under the Home Mortgage Disclosure Act. By 1998, this number had increased by more than 900 percent to 790,000. "The magnitude and speed of the increase in subprime lending alone— almost 1000% in just five years—creates a critical need for greater scrutiny and concern. While the rapid growth of subprime lending may, on the surface, appear to be good news for higher-risk borrowers, behind the numbers there is some evidence that some portion of subprime lending is occurring with borrowers whose credit would qualify them for conventional loans. Subprime lending may expose borrowers to higher up-front fees and interest rates than they would bear if they had obtained prime loans." (HUD Rep., *supra*, http://www.hud.gov/library/bookshelf18/pressrel/subprime.html.)

neighborhoods to have subprime loans.[4] HUD concluded that its analysis "clearly demonstrates the exponential growth in subprime lending and its disproportionate impact on low-income and particularly, minority homeowners and communities throughout the nation." (See HUD Rep., *supra*, http://www.hud.gov/library/bookshelf18/pressrel/subprime.html.)

As HUD's conclusions illustrate, Oakland's particular interest in regulating subprime loans goes beyond merely protecting its particularly vulnerable citizens. As one amicus curiae points out, "predatory lending is not just a consumer protection issue; it is a *community development* issue, because it threatens the stability of lower income homeowning neighborhoods . . . . [¶] Predatory home mortgage lending has enormous impacts on targeted neighborhoods. Predatory lending practices, particularly the phenomenon of 'asset based lending,' contribute to an increase in the number of foreclosures. This can result in abandoned houses and blighted neighborhoods and contribute to the physical and economic deterioration of lower-income, minority, and inner city communities. 'Foreclosures, especially in low- and moderate-income neighborhoods turn what might be typically viewed as a consumer protection problem . . . into a community development problem, in which increased foreclosures lead to property abandonment and blight.' " (Quoting HUD Rep., Recommendations to Curb Predatory Home Mortgage Lending (June 2000) pp. 24–25, available online at http://www.treas.gov/press/releases/reports/treasrpt.pdf [as of Jan. 31, 2005].)

In view of the community degradation caused by predatory lending, Oakland reasonably could have concluded that it was important to include holders in due course within the Ordinance's purview. The bulk sale of mortgage loans on the secondary market is the primary profit incentive for subprime mortgage lenders. (See Eggert, *Held up in Due Course: Predatory Lending, Securitization, and the Holder in Due Course Doctrine* (2002) 35 Creighton L.Rev. 503, 577 [noting that a primary reason for the rapid growth of the industry "is that the existence of ready capital available to lenders through the securitization of subprime loans has dramatically increased their ability to make those loans"].) The innovation of selling mortgage loans in bulk is, in fact, what fueled the enormous growth of the subprime mortgage industry. (See *id.* at p. 578) As the City of Oakland points out, "sales of subprime loans by predatory lenders is the inducement and profit-basis for their business practice of encouraging ever higher and larger loans to subprime borrowers, i.e. larger 'inventory' of loans for sale to others—all to the detriment of the consumer public." Thus, Oakland reasonably could have

---

[4] HUD also analyzed the prevalence of subprime loans in five urban areas (Atlanta, Philadelphia, New York, Chicago, and Baltimore), concluding that a study of the five cities "gives a good sense that the trends identified above are consistent at the metropolitan level." (HUD Rep., *supra*, http://www.hud.gov/library/bookshelf18/pressrel/subprime.html.)

concluded that because the bulk of subprime loans are sold on the secondary market, the Ordinance would have significantly greater deterrence effect if borrowers were able to invoke the defense of predatory lending in a foreclosure or other enforcement action against the secondary buyers who otherwise might be immune from liability. Otherwise, as one amicus curiae points out, "[s]ince most subprime loans are sold on the secondary market, the lack of assignee liability provides little incentive to the industry to clean up its practices."

The Legislature was free to conclude that treatment of predatory lending requires statewide uniformity. Alternatively, however, it could conclude that only a statewide minimum standard of conduct is necessary, and that local jurisdictions have some freedom to additionally regulate predatory lenders pursuant to the municipal police power to prevent urban decay and neighborhood blight. Because of the local, varying nature of the problem, this is not a case in which having differing local standards is wholly illogical. (Cf. *Tolman v. Underhill* (1952) 39 Cal.2d 708, 713 [249 P.2d 280] [loyalty oaths for state employees requires uniform treatment]; *Northern Cal. Psychiatric Society v. City of Berkeley* (1986) 178 Cal.App.3d 90, 102 [223 Cal.Rptr. 609] [no special local interest with regard to regulation of electroshock therapy].) All we can be certain of is that Division 1.6 was the product of a legislative compromise, and that the compromise included deliberate silence on the matter of preemption.

As discussed above, predatory lending is characterized by loans that are aggressively marketed to borrowers who often cannot afford the payments and eventually default on the loans. The city argues that the high rate of default and foreclosure has led to the degradation of entire neighborhoods and has contributed to the already substantial problem of urban blight in Oakland. The field of predatory lending regulation is one in which conditions peculiar to the locality are likely to differ from place to place and where supplemental regulation may well fall within the realm of local government. (*Gluck v. City of Los Angeles, supra*, 93 Cal.App.3d 121, 133 [upholding a Los Angeles ordinance regulating the placement and display of news racks on public rights-of-way].)

This court has acknowledged that the balance of power between state and local municipalities recognizes that a one-size-fits-all solution is not always in the best interest of the residents of a particular community. (See, e.g., *California Rifle & Pistol Assn. v. City of West Hollywood, supra*, 66 Cal.App.4th 1302, 1318 [recognizing the need for caution in "depriving local municipalities of aspects of their constitutional police power to deal with

local conditions"].) Keeping this in mind, courts have taken care to harmonize the general law and the localized need for municipal regulation even where the record reveals a pronounced statewide interest and a comprehensive statewide scheme relating to the field. (See, e.g., *People v. Butler* (1967) 252 Cal.App.2d 584 [60 Cal.Rptr. 659] [upholding ordinance prohibiting consumption of alcoholic beverages on public streets despite a comprehensive statewide scheme relating to such beverages]; *Gleason v. Municipal Court* (1964) 226 Cal.App.2d 584 [38 Cal.Rptr. 226] [upholding local ordinance proscribing loitering despite the then broad sweep of Penal Code section 647].) The case before us falls squarely within this line of precedent.

The cases cited by the majority do not compel a contrary conclusion. Although our numerous preemption cases resist easy harmonization, one theme that emerges is that those municipal ordinances that have been found to be preempted have been seen as subverting, in some tangible way, the purpose and intent of the state statute. This is true of each of the cases relied upon by the majority. In *Wilson v. Beville* (1957) 47 Cal.2d 852 [306 P.2d 789], we invalidated a local ordinance that attempted to impose conditions more stringent than those imposed by the state on the exercise of the power of eminent domain by specifying a shorter statute of limitations for the filing of a claim. There, we observed that a "city charter cannot give a shorter time, make more onerous the recovery of compensation, than the legislation has." (*Id.* at p. 861). We also observed that "a municipality may not curtail or abridge the rights so granted [right to recover for tort] by specifying, through charter provision, a shorter time limitation . . . than the period fixed by the statute." (*Ibid.*, italics omitted, citing *Eastlick v. City of Los Angeles* (1947) 29 Cal.2d 661, 666 [177 P.2d 558].) The local legislation thus undermined the statute by making the recovery of compensation more onerous. As such, the local ordinance was invalid because the Legislature had "provided a complete and detailed system for exercising the right of eminent domain and assessing compensation." (*Wilson v. Beville, supra,* 47 Cal.2d at p. 860.)

Similarly, in *Eastlick*, we struck down a requirement in the Los Angeles City Charter that required a personal injury claimant to itemize the damages in her claim. The requirements for a personal injury claim under state law did not require such specificity. (*Eastlick v. City of Los Angeles, supra,* 29 Cal.2d 661, 666.) Again, as in *Wilson*, the locality had attempted to abridge and circumscribe a state law right, thereby undermining the purpose of the state regulation. (*Ibid.*) Likewise, in *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 152 [130 Cal.Rptr. 465, 550 P.2d 1001], we invalidated a provision in the Berkeley City Charter that attempted to impose additional restrictions on a landlord's right to evict a tenant. There, we observed that

requiring "landlords to fulfill the elaborate prerequisites for the issuance of a certificate of eviction by the rent control board before they commence the [state] statutory proceeding would nullify the intended summary nature of the [statutory] remedy." (*Id.* at p. 151.) In *Isaac v. City of Los Angeles* (1998) 66 Cal.App.4th 586, 600 [77 Cal.Rptr.2d 752], the Court of Appeal held that an ordinance that gave utility liens priority over other recorded liens was preempted "because it disrupts California's statewide statutory scheme of lien priority" by giving the utility lien a priority over other liens that the state has determined should have priority.

The common theme running through these cases is that a locality may not impose additional burdensome requirements upon the exercise of state statutory remedies that undermine the very purpose of the state statute. Here, we are presented with a fundamentally different relationship between the state statute and local regulations. The Ordinance does not appear to undermine any of the stated goals of Division 1.6. To the contrary, the ordinance grants borrowers additional rights not afforded under state law, such as restrictions on prepayment penalties, mandatory credit counseling, and the opportunity to present defenses to secondary buyers of their mortgages if the borrowers have been victimized by predatory lending practices. Far from subverting Division 1.6, the Ordinance furthers the stated goal of the state legislation by providing additional protections to the low-income borrowers in Oakland who are especially vulnerable to predatory lending practices.

The majority argues, however, that the Ordinance *does* disrupt the balance struck by the Legislature in enacting Division 1.6. The majority asserts that Division 1.6 balanced "the need to protect particularly vulnerable consumers from predatory lending practices and the concern homeowners not be unduly hindered in accessing the equity in their own homes." (Maj. opn., *ante*, at p. 1257.) The majority observes that "[s]evere regulation of subprime lending might cause lenders to cease making such loans in California, or preclude borrowers from obtaining a loan based on equity in their home even though such loans can serve a legitimate need. . . . Thus, the Legislature was aware regulation of certain predatory practices in mortgage lending, practices which occur most often in the subprime market, could have the unintended consequence of hurting those the legislation was intended to help, and sought to balance these competing concerns. The Ordinance, and the possibility of other divergent and competing local measures throughout California, upsets that balance." (*Id.*, at pp. 1257–1258.)

Although it undoubtedly is true that the Legislature struck a balance to ensure passage of the bill, the balance was the product of compromise between consumer protection interests and finance industry interests. In order to glean the intent of the Legislature regarding preemption, we must examine the entirety of that compromise, and not selective parts of it. As discussed above, that compromise included the omission of any provision relating to preemption of local legislation. Yet, the majority concludes that preemption nonetheless was intended, emphasizing the Legislature's supposedly overriding concern regarding the threat that patchwork regulation might pose to low-income borrowers' access to capital. This emphasis on the need to prevent undue regulation ignores the principal purpose of Division 1.6, which is to improve consumer protection against predatory lending practices, *not* to protect lenders from unduly restrictive regulation.

The majority's implicit assumption is that Oakland's Ordinance, by providing for stricter regulation of certain areas of subprime lending, necessarily will cause lenders to cease making loans in Oakland and in California as a whole. (Maj. opn., *ante*, at pp. 1257–1258.) Had a majority of the Legislature agreed with that proposition, however, it could be expected that the legislation would have included a provision expressly preempting local legislation. The conscious omission of an explicit preemption provision demonstrates that the Legislature could not agree that local legislation would undermine or impair the objectives of the state legislation. Furthermore, should the undesirable consequences forecast by the majority come to pass, the Legislature, of course, would be free to step in and add an express preemption provision to Division 1.6.

The majority also places great emphasis on the City's admission that in more than 150 years of California history, no municipality has attempted to regulate mortgage lending. (Maj. opn, *ante*, at p. 1255.)[5] But we never have required a locality to prove a historical practice of regulation to establish the validity of a local regulation. Rather, as outlined above, the proper inquiry requires a clear indication of legislative intent and a studied balance between the need for state uniformity and the particular interest of the locality. Although historical regulatory patterns may be significant in assessing legislative intent, we must assess that history in context. The subprime mortgage industry has undergone tremendous growth in recent years. (See *ante*, fn. 3.)[6] During that period, predatory lending has had a grossly disproportionate

---

[5] Of course, as the majority acknowledges, Oakland is not the only municipality seeking to regulate in this field. Los Angeles also recently enacted an Ordinance regulating predatory lending practices. (L.A. Mun. Code, ch. XVIII, art. 1, § 181.07, subd. (B).)

[6] Moreover, the Legislature was aware that historically, the subject of subprime lending has not been addressed by existing regulation. A bill analysis stating the purposes of Assembly Bill No. 489 states that "[t]he licensing laws under which subprime lenders operate predate the development of the subprime market and therefore did not envision the types of problems that

impact on low-income and minority homeowners and communities. Under these circumstances, it is reasonable that the communities most affected would see a need to take action to protect their residents.

Thus, despite the circumstance that mortgage regulation historically has occurred at the state rather than the local level, we must recognize the concerns implicated by the recent rapid escalation of predatory lending. In view of the documented evidence that predatory lending is especially pervasive in low-income and minority neighborhoods, it is beyond dispute that Oakland and other similarly situated localities have a more significant interest in regulating subprime lending than localities that, because of demographics and composition, are not targeted in similar ways. Local regulation thus is not only constitutionally valid, but practically vital to the affected communities. Although predatory lending certainly is a matter of statewide concern, the specific interests of the communities most affected by the banned practices make the regulation of this field particularly amenable to local variations. Oakland's own interest in preventing predatory lending provides ample justification for that locality's enactment of stricter and more protective regulations designed to ensure that its residents receive adequate information before saddling themselves with financial obligations that could prove devastating.

In sum, I agree with the city and the decision of the Court of Appeal below that Division 1.6 establishes a floor, not a ceiling, for the regulation of predatory lending practices. As the majority recognizes, the rule of implied preemption is a " 'rule of necessity, based upon the need to prevent dual regulations which could result in uncertainty and confusion.' " (Maj. opn., *ante,* at p. 1252.) As discussed above, the Ordinance provides added protections for its citizens that will not result in uncertainty or confusion, and absent a clearly evident legislative intent I believe the Ordinance is not preempted.[7]

---

have arisen in this market. In fact many real estate loans are specifically exempted from consumer protections in these laws." (Assem. Com. on Appropriations, Analysis of Assem. Bill No. 489 as amended May 1, 2001, p. 3.)

[7] Although the majority does not reach the point, I note that AFSA also argues that because the Ordinance does not apply to federally chartered lenders, it is preempted by Civil Code section 1916.12, which creates a mechanism for the state to respond to changes in federal lending laws by adopting conforming changes in the regulation of state lenders. I agree with the Court of Appeal that Civil Code section 1916.12 does not preempt the Ordinance. Section 1916.12 does not evidence a legislative intent to preempt and does not mandate absolute parity in the treatment of federal and state lenders at either the state or municipal level, and thus does not preempt the Ordinance.

I would affirm the judgment of the Court of Appeal, upholding the validity of Oakland's antipredatory lending ordinance.

Kennard, J., and Moreno, J., concurred.