Filed 4/22/22

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CLARK BROS., INC., <br><br>     Plaintiff, Cross-defendant and Respondent, <br><br>     v. <br><br> NORTH EDWARDS WATER DISTRICT, <br><br>     Defendant, Cross-complainant and Appellant; <br><br> TRAVELERS CASUALTY AND SURETY OF AMERICA, <br><br>     Cross-defendant and Respondent. | D077200 <br><br><br> (San Bernardino County Super. Ct. No. CIVDS1511273) |

APPEAL from a judgment of the Superior Court of San Bernardino, John M. Tomberlin, Judge. Affirmed.

Leon A. Brunet and Leon Alejandro Brunet for Defendant, Cross-complainant and Appellant.

SMTD LAW and Jonathan J. Dunn for Plaintiff, Cross-defendants and Respondents.

_____

[*]     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts B, C, and D of the Discussion.

Drinking water provided by North Edwards Water District (North Edwards) to its customers contains three times the legal limit of arsenic, a carcinogen. Using funds earmarked for safe drinking water, the State of California (State) agreed to pay for North Edwards to construct a water treatment facility (the Project) to address this issue. In December 2013, Clark Bros., Inc. (Clark), a general contractor, was awarded the $6.2 million contract (Contract). But almost from inception, disputes arose between Clark and North Edwards. Ultimately in October 2014, while Clark still had three months to perform, North Edwards terminated the Contract. To date, the Project has not been completed.

Clark sued North Edwards for breach of contract (and related claims); North Edwards cross-complained against Clark alleging similar theories. After a six week trial, a jury unanimously found North Edwards breached the Contract and awarded Clark over $3 million in damages. Clark also prevailed on North Edwards's cross-complaint.

Under Public Contracts Code[1] section 20104.50, subdivision (b), a local agency that fails to pay progress payments within 30 days "shall pay interest" on the late payment. Here, as it awaited money from the State, North Edwards frequently took 60 days or more to pay. Based on this statute, which was incorporated into the Contract, the court instructed the jury that North Edwards was contractually "required" to pay Clark within 30 days. In closing argument, Clark's attorney used this instruction to argue that North Edwards breached by making late progress payments.

On appeal, North Edwards contends the instruction was prejudicially erroneous because (1) section 20104.50 provides for interest on late payments, but does not make late payment a *breach* of contract; (2) the

---

[1] Undesignated statutory references are to the Public Contracts Code.

2

statute does not apply to State-funded projects; (3) Clark waived its claim by repeatedly accepting late payments; and (4) North Edwards was not required to pay Clark until it received reimbursement from the State for each payment claim.

We agree with North Edwards's first argument—section 20104.50 does not "require" payment within 30 days. Rather, it requires late payments be accompanied by 10 percent interest. The legislative purpose is to create a strong economic incentive for local government to pay promptly and to compensate the contractor when delay occurs—not to put local government in breach on multimillion dollar public works contracts whenever a progress payment is late.

As we will explain, however, the error was not prejudicial. There was substantial evidence that North Edwards committed several far more serious breaches. More importantly, the jury awarded the exact amount of damages calculated by Clark's expert, which did *not* include any amount for late payment. Thus, the record affirmatively shows the verdict was unaffected by any instructional error concerning prompt payment requirements.

North Edwards further contends the trial court prejudicially erred in making several evidentiary rulings. We also reject these contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Events Leading Up to the Contract*

North Edwards is a public agency that furnishes water to about 220 customers in the Mojave Desert. It has one employee, Dollie Dimples Kostopoulos.

In June 2010, the State funded a study to determine how best to remove excessive arsenic levels from North Edwards's water supply. Three

3

companies—Filtronics, Layne Christensen, and Pureflow—participated in a simulated "full scale arsenic removal." According to AECOM Technical Services, Inc. (AECOM), the engineering firm administering the study, Layne Christensen won the competition. Pureflow finished last.

Although the study was intended to objectively determine the best filter system subcontractor, even after Pureflow lost North Edwards insisted that all three companies be allowed to bid on the Project. Jesse Dhaliwal, an engineer employed by the State, disagreed because "Layne [Christensen] was the clear winner." Nevertheless, Clifford Moyle, a North Edwards board (Board) member told Dhaliwal that the Board had the "right" to choose. Moyle, who describes himself as "an expert in all things construction," threatened that if the State did not allow North Edwards to choose the filter subcontractor, it would scuttle the Project and supply arsenic laden water "forever."

For reasons never fully explained despite six weeks of testimony, North Edwards was adamant that Pureflow be selected, even though:

- Layne Christensen had the least expensive waste disposal system;
- Filtronics offered the least expensive operation and maintenance over 20 years; and
- Pureflow had the highest capital cost.

The Board's insistence was also a bit puzzling because Pureflow does not actually manufacture anything. It does not have a contractor's license, it has no proprietary designs or patents, and does not even own a wrench. Everything Pureflow sells is made and installed by other companies.

In any event, Dhaliwal backed down and allowed North Edwards to select Pureflow as the filter system subcontractor. Shortly after, Pureflow asked to be paid about $600,000 in advance, before any equipment was even

manufactured.  The State rejected that notion, countering that no payments would be made until at least half the equipment was delivered to the job site.

On January 8, 2013—before general contractors had even bid—Pureflow and the State compromised on payment terms.  They agreed that Pureflow would be paid for each major piece of equipment as and when it was manufactured and passed inspection at the manufacturing facility.  This was incorporated into the Project specifications, making it binding on whichever general contractor was awarded the contract.

In early May 2013, the State agreed to fund $4.9 million "to assist in financing a project which will enable [North Edwards] to meet safe drinking water standards . . . ."  North Edwards was "solely responsible" for the Project's design and construction.  The State agreed to disburse funds to North Edwards after approving progress payment claims.  An accompanying document informed North Edwards it was solely responsible for paying contractors "in a timely manner per the contractual requirements between them irrespective of whether payment has been received from the [State]."

About three weeks later, North Edwards hired AECOM as the Project's engineer and its representative on the job.  Around the same time, Pureflow sent North Edwards a revised quotation ($959,815) listing equipment the successful bidding contractor would be obligated to purchase from Pureflow at specified prices.[2]  The quote states the general contractor will pay Pureflow as and when equipment was made and passed inspection.

B.  *Clark is Awarded the Contract*

Out of 10 general contractors submitting bids, Clark's was the lowest at about $6.2 million.  In December 2013, after the State increased funding to

---

[2]  Pureflow separately charged North Edwards $240,000 for preparing the specifications general contractors needed in formulating their bids.

5

$7.8 million, North Edwards awarded the Contract to Clark. Pureflow told Clark it would start fabricating the equipment and expected to have all of it delivered to the job site within 18 weeks after AECOM approved its drawings. On January 22, 2014,[3] Clark's one year period to complete the Project commenced.

Six days later, Pureflow complained of cash flow problems. Clark sought to reassure Patrick Kennedy, Pureflow's owner, that as a matter of practice Clark paid its subcontractors within 10 days after receiving payment from the Owner.

At a preconstruction meeting on January 30, Pureflow stated it would complete performance by September 16. It also asked to be paid *in advance*— even though (1) the State had already rejected that proposal a year ago; and (2) just two weeks earlier Clark accepted Pureflow's quotation, which provided Pureflow would be paid as equipment was manufactured and passed inspection. The State once again rejected Pureflow's request for money up front.

As might be expected in a State-funded but locally administered project, getting progress payments approved by the State and money disbursed takes time. At the January preconstruction meeting, Dhaliwal said the State would process payment requests in 45 to 60 days. But in practice, it commonly took 90 days or longer.

C. *The Power Pole Relocation Problem and Delays*

The project site was mostly vacant land, but there were two power poles and overhead electrical lines running through the middle of the site. Relocating them was an important first task because the poles were

---

[3] All dates from this point are in 2014 unless otherwise specified.

"right . . . where structural concrete slabs went" and the overhead power lines were a significant danger for workers using heavy equipment. As the owner, it was North Edwards's obligation to move the poles and power lines *before* Clark started work. Based on information supplied by AECOM and North Edwards, Southern California Edison (Edison) planned to move the poles by March. Clark scheduled his work accordingly, to begin on site in April.

In January, however, Clark noticed that the planned relocation would place the poles in conflict with Project water lines and a block wall. Clark was right, and as a result AECOM had to go back to the drawing board. The only solution was to move the poles and power across the street onto private property. It was North Edwards's and AECOM's responsibility—not Clark's—to obtain an easement from that landowner, redesign the relocation, and obtain Edison's approval for the new plans. AECOM did not submit revised plans to Edison until late June. There was nothing Clark could have done to expedite this.

North Edwards did not obtain an easement to relocate the power poles until early October. In the meantime, Clark's forces began work even with the poles and high voltage lines in the middle of the property. But some aspects of the Project, including some of the concrete slabs and equipment to be located on them, "just flat out couldn't get done until those power poles were moved." Under the Contract, Clark was entitled to a 230 working-day extension of time because of North Edwards's delay in moving the power poles.

D. *North Edwards Demands Clark Enter Into an Unlawful Lease*

Consistent with common practice, the Contract allowed Clark to use the job site for "laydown, staging and construction." Accordingly, in early April Clark brought workers, trailers, and heavy equipment to the remote

desert job site.[4]  Nevertheless, on literally the first day of work North Edwards refused to allow Clark's equipment on site, instead insisting it lease a nearby vacant lot for that purpose.  By no small coincidence, that lot was owned by James Allen—who is in a relationship with Kostopoulos.[5]  Allen demanded $5,000 rent (or alternatively, that Clark build a six-foot chain link fence with sliding gate on the property).

Clark had been in the construction business for over 60 years, but this was a first.  Never before had a public owner required payment as a condition to doing the work.  After learning the lease was unlawful, Clark refused to pay Allen, who replied that Clark was " 'poison' " and should " 'get the hell out of here.' "[6]

E.  *Undisclosed Gas Lines*

AECOM's plans showed one underground gas line on the property.  But early on, Clark discovered "a lot of [underground] gas lines" not depicted in the plans.  This complicated the work, as water lines had to be "delicately" threaded "in between, over and under gas lines."  It also required complex changes in the type of pipe Clark was required to install.

---

[4]  Between being awarded the Contract in January and mobilizing in April, Clark prepared about 100 submittals, each about two or three inches thick, for AECOM's approval.

[5]  Kostopoulos testified in deposition that she and Allen lived together and were "lifetime partners."

[6]  This was not the only such incident.  North Edwards billed Clark *double* the usual price for water used on site.  It also billed the State $14,000 for Kostopoulos's office services.

F. *The Second Water Well*

The project site has one water well, and the plans called for construction of a second one about 20 feet away. When the well driller arrived, he refused to construct the new well because it was too close to the existing one. Clark's president, Lawrence Clark, explained:

> "And with it only being 20 feet away from the existing well that's actually sucking water out, it creates the scenario where chemicals and the pressure can transfer from the new hole over to the old hole and have a cave in or contaminate the drinking water, because you're down there with chemicals and drilling fluid and all sorts of stuff."

Clark proposed "a couple of different workarounds," but the issue was not resolved before North Edwards terminated the Contract. This caused an 85-day delay for which Clark was not responsible.

G. *Pureflow Demands Cash in Advance and Early Payment for Filter Media*

In late April, Kennedy again (now, for the third time) demanded cash in advance. And in a related move, he also notified Clark that Pureflow would deliver the filter media[7] to the job site right away, thus triggering a $149,000 progress payment—even though there was no place to put it. The tanks that would hold the media had not even been made yet.[8]

North Edwards refused to agree to the early filter media delivery, stating that "financing" Pureflow was not its responsibility. Clark explained the "big picture" was that without the early payment for the filter media, "[P]ureflow will not be able to finish this project and in return this project

---

[7]    Filter media is a fine porous substance (resembling sand) that removes arsenic and other substances from water.

[8]    Pureflow needed the cash. The Project represented about one-third of Pureflow's total annual revenue, and its suppliers were not extending credit.

will end up in court with everyone pointing fingers at each other." Clark reminded North Edwards that he "did not pick Pureflow to supply the filtering system nor did Clark have the opportunity to select another supplier." He urged North Edwards "to come together . . . on how [P]ureflow financially will supply and finish this project."

Despite North Edwards's objections, Pureflow delivered the filter media early. Clark alone bore the cost of storing it.

## H. *Pureflow's Failure to Perform*

All the Pureflow-supplied equipment should have been delivered on site by mid-July. On June 23, Clark asked AECOM to identify which Pureflow-supplied equipment it had inspected. In response, AECOM did not identify any, and instead stated that Pureflow was Clark's problem. The next day, Clark notified AECOM and North Edwards of Pureflow's "potential failure to meet project schedule." Clark reserved its rights "to claim additional costs, including but not limited to . . . delay and consequential damages . . . ."

Like AECOM, North Edwards responded by claiming Pureflow was Clark's problem—even though North Edwards selected Pureflow and negotiated its payment terms before Clark even bid on the project. Clark's expert testified that as the project owner that had selected Pureflow, North Edwards "need[ed] to take ownership of it. Typically, the owner will step up and do that."

On June 27—now six months into the Project—Pureflow had done virtually *nothing* apart from the early delivery of filter media. Clark was also "shocked" that Pureflow "didn't seem to care." Three days later, Pureflow asked Clark for a $503,000 advance of "working capital" so it could "move forward" on the Project. This was now its *fourth* attempt to change agreed upon payment terms. Now desperate to try to complete the Project as close to

10

on-time as possible, Clark asked Dhaliwal to authorize the half-million dollar advance.

On July 3, Moyle on behalf of North Edwards e-mailed Clark with instructions to "dump" Pureflow:

> "I understand you and one of your suppliers are having trouble delivering said equipment and designated system. That is not the problem of [North Edwards] . . . . Go direct to the suppliers and buy the equipment you contracted to supply to us. We don't care if you have to dump Pureflow as your package supplier."

About a week later, and consistent with Moyle's instruction, Clark sent a "formal notice of breach of contract" to Pureflow. Clark asked AECOM to identify another filter vendor, noting that Pureflow had already caused at least a 120-day delay.

But three weeks later, North Edwards reversed position, telling Clark, "[Y]ou cannot replace Pureflow." Meanwhile, the State had agreed to Pureflow's demand for cash in advance. North Edwards claimed Clark was responsible for $200,000 in delays and penalties resulting from Pureflow's conduct.

By the end of July, Pureflow agreed to give Clark the names and amounts due its suppliers in anticipation of joint checks being prepared once the advance funds arrived from Sacramento. But Pureflow never gave Clark that information.

> "Q: Mr. Kennedy, is it fair to say that you knew all along that if you gave Clark Bros. this information, company names, the contact names, the telephone numbers, the evidence of the cost of the products . . . that Clark Bros. could go around you and purchase all of those items and have your vendors build them with you, and you would have lost your profit?
>
> "A: That thought crossed my mind."

11

On August 8, and without telling Clark, Kostopoulos and Allen met with Kennedy. They discussed whether North Edwards could contract directly with Pureflow and exclude Clark. Kostopoulos said she intended to send the State's $500,000 advance directly to Pureflow, bypassing Clark.

Later that month, Moyle told the Board he had consulted a lawyer who agreed to "write two very strong letters, one to Clark, one to AECOM, and make them know they have to shit or get off the pot." Moyle instructed the lawyer to "kick their ass." When a North Edwards's Board member asked Moyle, "What about Pureflow?" he replied, "Well, [the lawyer's] not doing anything about Pureflow. He's going to tell Clark he can't fire Pureflow . . . ." Kostopoulos sent Archie MacDonald, Pureflow's vice-president, an e-mail, stating she was " 'doing everything' " she could to force Clark to " 'rescind the termination of Pureflow ASAP.' " MacDonald thanked Kostopoulos for her " 'tremendous effort,' " stating, " 'Enjoy your weekend and go for a drive in your [Audi] A8. You deserve it.' "

Despite this march towards litigation, for a brief period it appeared the parties could salvage the Project. On September 17, the State finally agreed to advance $500,000 for Pureflow. Clark and North Edwards agreed to disburse that money to Pureflow's vendors by joint checks. All other terms of Pureflow's purchase order would remain unchanged. But two days later, Pureflow quashed that agreement because the joint checks would not include any amount for Pureflow's mark-up. From Clark's perspective, once again Pureflow was holding the Project "hostage."

By October 8, North Edwards and AECOM agreed to Pureflow's demand—the State's advance would pay not only for the equipment, but Pureflow's profit too. A week later, Clark was informed of this new agreement. Clark still wanted the money disbursed by joint checks to ensure

it was used for the equipment.  Joint checks "are normal in the construction industry."

For reasons not explained at trial, North Edwards would not agree to disburse the $500,000 advance by joint checks.  Under a document entitled "Reinstatement and First Amendment to Purchase Order" (Reinstatement), it was instead agreed that after receiving payment from North Edwards for amounts due Pureflow, Clark would wire funds to a trust account held by Pureflow's lawyer.  From that account the lawyer would pay (1) vendor invoices; (2) 90 percent of Pureflow's profit when the equipment shipped; and (3) Pureflow's remaining 10 percent profit on delivery.

Because "everybody had signed off" on the Reinstatement and "there were attorneys present," Clark believed Pureflow and North Edwards were "going to actually follow through with this."  In the end, Pureflow would receive every penny it asked for, and at the same time it was not held responsible for delays.  Still, the Reinstatement was a "huge" relief for Clark—the Project was finally moving forward.

But that did not last long.  Just six days later on October 20, North Edwards terminated the Contract.  Oddly, however, the Board kept this a secret from Clark for nearly two weeks.  At a construction meeting on October 27, Lawrence Clark said his crew heard rumors they had been terminated.  Kostopoulos (falsely) replied, "I can guarantee you" that North Edwards did *not* terminate the contract.  She accused Clark or his workers of "making something up."

A day or so later, Clark received a letter from North Edwards's attorney entitled, "Notice of Intent to Terminate Contract."  Ironically, the same day Clark also received Pureflow's $500,000 advance from North Edwards.  On November 10, Clark returned that money to Kostopoulos.

13

In mid-November, North Edwards hired an engineer, Chuck Krieger, who Kostopoulos knew to be "very knowledgeable about water plants" and who in the past had worked for North Edwards. The Board asked Krieger to inspect Clark's work and determine "what needs to be done to complete" it.

A few weeks later at a Board meeting, Kostopoulos read aloud part of Krieger's report, which stated:

> " '[A]lthough[ ] there have been some issues at the job site -- many, if not most, appear to have been corrected or correctable and there still appears to be time within the contract completion schedule to remedy such deficiencies other than construction of Pureflow facilities and the new well site.

> " 'Given the very real possibility that in the event of litigation against the district, [Clark] may prevail with regards to various issues it raises[,] . . . [¶] [i]s there any desire by [North Edwards] to deescalate the matter and determine if there is any possibility of resolving the existing situation without litigation?' "

After reading this, Kostopoulos asked her fellow Board members, "In other words, do we want to kiss Clark's ass and take him back?" Apparently, the answer was no. The Board fired Krieger.

At the same meeting, Kostopoulos also reported that North Edwards's attorney "strongly urg[ed]" it to "immediately reconsider its position and attempt to resolve the matter with [Clark]." Kostopoulos called their lawyer "a little weasel" who did not have "balls enough to fight this thing." Instead of heeding their lawyer's advice, the Board fired him.

Moyle suggested posting "No Trespassing" signs to both deter Clark from returning to the job site to allow them to "shoot" him if he did. Another Board member commented, with "buckshot in their butts," "[t]hey'll think twice about coming back." When at trial Moyle was asked, "Did you stop to

14

consider, Mr. Moyle, that maybe the lawyer and maybe Mr. Krieger actually were giving you good advice?" he replied, "I don't think so."

## I. *Verdict and Judgment*

In a first amended complaint (Complaint), Clark sued North Edwards and the State for breach of contract and related claims. North Edwards cross-complained against Clark and the insurer who issued its performance and payment bond. The State settled with Clark for $2.7 million before trial.

By special verdict, the jury found that North Edwards breached its contract with Clark, resulting in $3,288.721 in damages. It also found in Clark's favor on North Edwards's cross-complaint. Postverdict, the court entered a $4,134,325.89 net judgment in Clark's favor.[9]

## DISCUSSION

A. *The Court Erroneously Instructed That North Edwards Was Contractually "Required" to Pay Clark Within 30 Days; However, the Error Was Harmless*

1. *Background*

The Contract incorporates by reference section 20104.50. Subdivision (b) of that statute provides in part:

> "Any local agency which fails to make any progress payment within 30 days after receipt of an undisputed and properly submitted payment request from a contractor on a construction contract shall pay interest to the contractor equivalent to the legal rate . . . ." (§ 20104.50, subd. (b).)

---

[9]   The net judgment includes: $182,656.14 in interest under section 20104.50, $834,952.72 in prejudgment interest, $2,185,806.93 in prevailing party attorneys' fees; $146,755.05 in expert fees and expenses under Code of Civil Procedure section 998, and $195,434.05 in costs. It also contains a $2.7 million offset for the State's settlement.

15

The Contract's supplement to general provisions additionally provides in paragraph 1.10(G):

> "The project is being funded with State of California Proposition 84 funds, payments to the contractor for work performed for each given month will be paid by the District only after it receives reimbursement from the State. . . ."

The Complaint alleges North Edwards "materially breached" by, among other things, "failing and refusing to pay [Clark] sums due under the contract within the time provided for the same pursuant to . . . section 20104.50." Before trial, Clark moved to exclude evidence regarding payment obligations contrary to this statute. Its attorney told the court, "[T]here is a statute on point that says, all public entities must pay within 30 days." The court denied the motion, but added that "doesn't mean [Clark] won't get an instruction . . . on the subject."

Lawrence Clark testified that the Contract, which incorporates by reference section 20104.50, requires the owner to pay the contractor within 30 days. He admitted knowing from the outset that the State needed 45 to 60 days to process payment requests. Nevertheless, he claimed that did not affect North Edwards's obligation under section 20104.50.

While discussing jury instructions with counsel, the court stated there was a "conflict" and "ambiguity" in the Contract because one provision required North Edwards to pay Clark within 30 days, but another stated it was required to pay only after receiving State reimbursement. The court construed this conflict against North Edwards as the drafter. Based on that ruling, the court instructed the jury that North Edwards "is required to make prompt payment to [Clark] for approved progress payment applications" and any provision "in the Contract Documents that are contrary to the prompt payment obligations of [North Edwards] as set forth in these instructions are

16

void and of no effect." The instructions also stated that if North Edwards failed to make any progress payment "within 30 days," Clark was entitled to 10 percent interest.[10]

In closing argument Clark's attorney urged the jury to find that North Edwards breached stating, "[T]hey're supposed to pay within 30 days. It's a Prompt Pay Act. It's in their contract. . . . It's now in your jury instructions, law on that."

> 2. *Section 20104.50 Does Not "Require" Progress Payments Be Made Within 30 Days; It Requires Interest Be Paid When Payment Is Made After 30 Days.*

California has many statutes designed to require prompt progress payments to general contractors and subcontractors. "These statutes are intended to discourage owners and direct contractors from withholding monies owed as a way of granting themselves interest-free loans." (*United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1088.) The statutes are scattered throughout the Civil Code, Business and Professions Code, Government Code, and Public Contracts Code.[11]

This case concerns a local agency's obligation to make progress payments to a general contractor, which is governed by section 20104.50. Subdivision (b) of that statute provides that "[a]ny local agency which fails to make any progress payment within 30 days after receipt of an undisputed

---

[10] The special instructions also stated that if North Edwards failed to pay within 30 days, Clark "is entitled to interest of ten percent." However, the parties stipulated that the amount, if any, of prompt payment penalties would be decided by the court in a post-trial motion. In closing argument, Clark's attorney told the jury, "Don't worry about interest" because that would be handled "separate and apart from your deliberations."

[11] (See, e.g., Civ. Code, section 8800; Bus. & Prof. Code, section 7108.5; Gov. Code, section 927; Pub. Contract Code, section 10261.5.)

17

and properly submitted payment request from a contractor on a construction contract shall pay interest to the contractor equivalent to the legal rate [set forth in Code of Civil Procedure, section 685.010]."[12]  Under subdivision (f) of Public Contracts Code section 20104.50, "[e]ach local agency shall require that this article, or a summary thereof, be set forth in the terms of any contract subject to this article."[13]

" 'In cases involving statutory interpretation, our " ' "fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose." ' [Citation.]  ' "If the statute's text evinces an unmistakable plain meaning, we need go no further." ' [Citation.]" [Citation.]  "We construe statutory language in the context of the statutory framework, seeking to discern the statute's underlying purpose and to harmonize its different components." ' " (*San Diego Navy Broadway Complex Coalition v. California Coastal Com.* (2019) 40 Cal.App.5th 563, 576.)

Here, the operative language in section 20104.50, subdivision (b) is that a local agency "which fails" to pay within 30 days "shall pay interest" at the legal rate.  Giving these words their plain meaning, the statute does not compel payment within 30 days.  What it compels is that interest be paid (at the legal rate) when payment is made after 30 days.

Of course, a 10 percent penalty for tardy payment is likely a strong incentive for local government to make progress payments within 30 days. But to incentivize payment within 30 days is not the same as to compel it.

---

[12]  Code of Civil Procedure section 685.010, subdivision (a) provides, "Interest accrues at the rate of 10 percent per annum . . . ."  Under subdivision (b) of that statute, the Legislature "reserves the right" to change this rate "at any time to a rate of less than 10 percent per annum."

[13]  Section 20104.50 is the only statute in article 1.7.  Thus, the reference to "this article" effectively means section 20104.50.

18

There may be a number of good reasons why a local agency might take longer than 30 days to pay. In this case, for example, the sheer bureaucracy in having payments approved by AECOM, North Edwards, and the State made payment beyond 30 days not only possible, but a near certainty.

Given the frequency with which even a good faith attempt to pay within 30 days may fail, section 20104.60 quite reasonably does not create a breach of contract every time a progress payment is made beyond 30 days. Rather, the legislative goal of prompt payment is effected by generously compensating the contractor for the time value of its money when delay occurs, and thus deterring tardy payments.

We accordingly hold that when section 20104.50 is incorporated into a local agency's public works contract, as it was here, the agency does not breach that contract merely by making a progress payment after 30 days. The statute is violated, and a breach of contract occurs, if and when the agency fails to pay the requisite interest after a late payment is made.

This interpretation of section 20104.50 is further supported by comparing it to other prompt pay statutes containing different language. For example, on private works of improvement, Civil Code section 8800 provides "the owner *shall pay* the direct contractor, within 30 days . . . any progress payment due . . . ." (Italics added.) Under Business and Professions Code section 7108.5, a prime contractor "*shall pay*" a subcontractor within "seven days after receipt of each progress payment, the amount on account of the work performed by the subcontractor." (Italics added in first quote.) Similar "shall pay" language is in Civil Code sections 8802, subdivision (b) ("the direct contractor shall pay the subcontractor the amount allowed . . . on account of the work performed by the subcontractor"), 8812 ("owner shall, within 45 days . . . pay the retention"), and 8814 ("direct contractor shall,

19

within 10 days . . . pay to each subcontractor . . . that subcontractor's share of the payment"). Similarly, Public Contracts Code section 7107, subdivision (c) provides, "retention . . . shall be released" and section 10262.5 states, "a prime contractor . . . shall pay to any subcontractor . . . the respective amounts allowed the contractor on account of the work performed by the subcontractor . . . ."

These statues illustrate that when the Legislature intends to *require* timely payment to a contractor or subcontractor (as opposed to merely incentivizing timeliness), it knows how to clearly say so. The absence of such language in section 20104.50, subdivision (b) thus manifests a different intention. (See *In re Jennings* (2004) 34 Cal.4th 254, 273, [" '[W]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to different statutes.' "].)

In asserting that section 20104.50 requires payment in 30 days, Clark points to a preamble in subdivision (a) of the statute that states, "It is the intent of the Legislature in enacting this section *to require* all local government to pay their contractors on time so that these contractors can meet their own obligations." (Italics added.) However, although the preamble certainly reflects the Legislature's serious concern about more than 30 days' delay in paying contractors, " 'legislative intent is not gleaned solely from the preamble of a statute; it is gleaned from the statute as a whole, which includes the particular directives.' [Citation.] And 'every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' " (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1118–1119.)

As explained, the plain meaning of subdivision (b) of section 20104.50 controls, especially when compared with distinct language in other prompt pay statutes. And in a very real economic sense, a 10 percent penalty for late payment will in many cases, effectively "require" local government to make progress payments within 30 days if at all possible.

In a related argument, Clark relies on another portion of the statute's preamble stating, "It is the intent of the Legislature in enacting this article to *fully occupy the field* of public policy relating to the prompt payment of local governments' outstanding receipts. The Legislature finds and declares that all government officials, including those in local government, must set a standard of prompt payment . . . ." (§ 20104.50, subd. (a)(2), italics added.)

However, this provision is directed at charter cities, not local agencies like North Edwards. "[C]harter cities . . . may adopt and enforce ordinances that conflict with general state laws, provided the subject of the regulation is a 'municipal affair' rather than one of 'statewide concern.' " (*American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1251.) Accordingly, a charter city's " 'local regulation is invalid if it attempts to impose additional requirements in a field which is fully occupied by statute.' " (*Id.* at p. 1252.) Here, by expressing an intent to "fully occupy the field," the Legislature has preempted any local ordinance by a charter city that might conflict with section 20104.50. Because North Edwards is not a charter city, and even if it were, there is no potentially conflicting local ordinance, this part of the preamble does not apply.

With section 20104.50 correctly interpreted, the irreconcilable conflict the trial court perceived simply disappears. Under the supplement to general provisions, North Edwards was not contractually required to make progress payments until it received such funds from the State. Under provisions in

21

the Contract incorporating section 20104.50, North Edwards is required to pay interest at the legal rate for payments made after 30 days.[14]

3. *The Error Was Not Prejudicial*

We turn now to whether the instructional error likely affected the outcome. A mistake in instructing the jury requires reversal only " 'where it seems probable' that the error 'prejudicially affected the verdict.' " (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) Here, we conclude it did not for two reasons. First, there was substantial evidence of numerous other (and much more serious) breaches by North Edwards, including its:

- Unwillingness to take responsibility, as the owner who chose Pureflow, for Pureflow's "failings in moving the project and delivering."

- Failure to extend Clark's time to perform based on delay in (a) moving the power poles and lines, (b) dealing with undesignated high pressure gas lines, and (c) drilling the new well close to the existing one.

- Improper management of the Project.

- Termination of Clark when the general contractor still had three months to perform, even without any time extension.

But although the case was tried on the theory that North Edwards committed several material breaches, the special verdict did not ask the jury to decide the issue with specificity. Question 2 merely asked: "Did North Edwards

---

[14]    Because of this disposition, it is unnecessary to consider North Edwards's contention that by repeatedly accepting late payments, Clark waived the "right" to be paid within 30 days.

22

Water District materially breach its obligations under its contract with Clark Bros., Inc. for the construction of the Project?  ＿＿ YES  ＿＿ NO."[15]

Nevertheless, we know the jury determined that North Edwards committed *at least* one other material breach that was entirely unaffected by the instructions on prompt payment.  In answering Question 6 on the special verdict form, it specifically found that North Edwards furnished Clark with plans that were "erroneous, misleading or inaccurate."  In closing argument, directing the jury's attention to verdict Question 2 (breach of contract), Clark's attorney made the express connection between Questions 2 and 6 when he stated that "most importantly, those plans and specs were not correct.  So this [Question 2] should be answered yes.  They materially breached their obligations."

Even more significant, North Edwards could not have been prejudiced by the instructional error because the record affirmatively demonstrates the jury did *not* base its damage award on tardy progress payments.  Clark's construction expert calculated damages by a simple formula that did not even consider late payment.  He determined the amount Clark spent on the Project ($5,021,755), deducted what North Edwards paid Clark ($2,250,133), added a reasonable amount for profit ($377,230) and overhead ($139,869), resulting in $3,288,721 in claimed damage.  The jury awarded this same $3,288,721.[16]

---

[15]    The record does not contain any competing verdict form, nor on appeal does North Edwards contend the trial court erroneously refused to give its proposed verdict form.

[16]    As previously noted (*ante,* fn. 10), Clark's counsel told the jurors *not* to award any damages based on North Edwards's failure to make timely progress payments because the court would make this calculation at a later time.  The jury's damage award makes it clear they followed this direction.

Thus, we are confident the verdict was unaffected by any instructional error regarding prompt payment obligations.

B.    *Any Error In Allowing Evidence of the State's "No-Cost, No-Fault" Settlement Proposal Was Harmless*

About a year after this litigation commenced, the State offered a "no-fault, no-cost" proposal to settle the matter. As counsel described it, the State offered to pay Clark to return to the site, refurbish items that had been in the desert and decaying for a year, and "finish the job"—without regard to "who's at fault." North Edwards rejected the proposal.

Before trial, Clark's attorney explained he intended to offer this evidence to show North Edwards failed to mitigate the damages alleged in its cross-complaint:

> "[O]ur position is really that this goes to the duty to mitigate. And they're going to put an expert up there that's going to say that project has set [*sic*] and rotted for four years, and it's Clark's fault. . . . [¶] And what the evidence is going to show is they could have had it finished by Clark Bros . . . . and by the State who agreed to cover that cost. And they [North Edwards] chose time and again to say no . . . ."

North Edwards countered that the State's proposal was inadmissible because made during mediation.[17] The court ruled that Clark could not offer evidence of "anything that has to do with mediation," but otherwise the evidence was admissible on mitigation of damages.

---

[17] The mediation privilege in Evidence Code section 1119, subdivision (a) provides in part: "No evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation is admissible," and in subdivision (c) that "All communications, negotiations, or settlement discussions by and between participants in the course of a mediation or a mediation consultation shall remain confidential."

At trial, Lawrence Clark testified that the State's "no-fault, no-cost proposal" was "always outstanding." Kostopoulos testified in her deposition that North Edwards rejected the proposal. In closing argument, Clark's attorney told the jury:

> "You know after the lawsuit the State came and said, we're going to offer a no-fault, no-cost proposal. Let's get Clark Bros. back out there. Let's get the job done. You've got a jury instruction here . . . about the duty to what we call mitigating [sic] damages. . . . [¶] They have an obligation to mitigate their damages. They have an obligation to get that job done. And the State wanted them to have Clark Bros. come back and do it. . . . They should have let Clark Bros. complete this project. They would have had no damages."

On appeal, North Edwards again claims the State's offer was made during "mediation" and was, therefore, inadmissible. However, the record citations in North Edwards's opening brief show that the parties participated in mediation, but not what was said during it. The closest North Edwards comes is a citation to Kostopoulos's testimony that the State's proposal was made "when we went down to San Bernardino." But there is no evidence that "San Bernardino" referred to mediation, as opposed to a settlement conference that the mediation privilege would not apply to, and there were no follow up questions to clarify.[18] In its reply brief, North Edwards states that "any doubts" about whether the proposal arose in mediation are resolved by an October 2016 filing in the trial court that asked for a "[m]andatory [s]ettlement [c]onference" after an unsuccessful mediation session. However, that document merely states the parties "tentatively agreed to certain deal

---

18    North Edwards's pretrial motion to exclude evidence of the State's proposal acknowledges it was made both in mediation and in "settlement conferences."

points" and the parties "left the mediation having compromised." It does not support the proposition that the State's no-cost, no-fault proposal was made only in mediation.

We have independently searched the record for any evidence, even a declaration, that would support a finding by the trial court that the State's proposal was only made in mediation; we can find none. North Edwards's trial brief contains an extensive discussion of the mediation privilege, but no declaration that the State's offer was made during mediation or only in mediation (as distinguished from a settlement conference). Similarly, North Edwards's motion in limine asserts the offer was made "numerous times during mediation," but contains no declaration or other evidence to show that.

On appeal, Clark contends the State's offer was made "long before the parties were even ordered to mediation." Although there is nothing in the record to show that either, it may explain the trial court's ruling—the State's settlement proposal was admissible on the duty to mitigate issue, but "anything that has to do with mediation" was *not*. In sum, on this record North Edwards cannot sustain its burden as appellant to show the court's ruling violated the mediation privilege.

North Edwards also contends the evidence was inadmissible under Evidence Code sections 1152 and 1154.[19] However, these statutes provide

_____

[19] Evidence Code section 1152 provides that an offer of compromise is "inadmissible to prove [the offeror's] liability for the loss or damage or any part of it."

Evidence Code section 1154 provides, "Evidence that a person has accepted or offered or promised to accept a sum of money or any other thing, act, or service in satisfaction of a claim, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove the invalidity of the claim or any part of it."

26

that a settlement offer is inadmissible only to show liability (Evid. Code, § 1152) or the claim's invalidity (*id.,* § 1154). Here, the evidence was offered not to show North Edwards's liability or invalidity of its claims, but rather that it had not reasonably mitigated its claimed damages.

In any event, even assuming the court should have excluded this evidence, the record affirmatively demonstrates any error was harmless. The evidence was offered (and argued) only to show North Edwards failed to reasonably mitigate claimed damages on its cross-complaint. But the jury never found it necessary to even reach that issue. In special verdict Question 9, the jury found that North Edwards did not perform its obligations under the Contract. The verdict form instructed the jury that after a "NO" answer to Question 9, it should "please answer no more questions." Accordingly, the jury never even considered Question 12, which asked whether North Edwards reasonably mitigated its damages—because the jury determined North Edwards was not entitled to recover *any* damages on its cross-claims.

In a related argument, North Edwards asserts that its rejection of the State's settlement offer should have been excluded because it "paint[ed] [it] as being unreasonable and loath to allow [Clark] to complete construction." Assuming without deciding that such an objection was preserved for appeal and had merit, any error would be harmless. There was ample other evidence that North Edwards acted unreasonably. The Board meeting where it fired its consulting engineer and attorney, each of whom advocated restraint and compromise, well established that.

C. *The Court Did Not Abuse Its Discretion in Allowing the Jury to Hear Audiotapes of North Edwards's Meetings*

North Edwards audio-recorded several Board and construction meetings. Among other things, these contain discussions about AECOM, Pureflow, and North Edwards's reasons for terminating Clark's contract.

27

Ironically, during a recording from a December Board meeting, Moyle instructs Kostopoulos not to turn over any "voice recordings." He did not want Clark's attorneys to have "a real time" view of the parties' interactions.

This "real time" view included derogatory and racist statements by North Edwards. For example, in one meeting Board members referred to an AECOM engineer as "Chewbacca" and discussed getting AECOM to fire him because he was "another black" who will "listen to what you're saying and do it his way." At another meeting, a Board member disparaged Clark, stating he "came from Harlem." As already noted, Kostopoulos referred to North Edwards's former lawyer as a "weasel" and questioned whether "he's got balls enough to fight this thing." Moyle also threatened to shoot Clark's personnel if they returned to the job site.

Before trial, asserting this evidence was both irrelevant and unduly prejudicial, North Edwards moved to exclude "all derogatory and offensive comments" its personnel made in the recordings. The trial court denied the motion, stating:

> "I can't imagine keeping that out . . . . It has to do with all kinds of factors. It has to do with bias. It has to do with motive. It has to do with potentially why it is that the [B]oard was not willing to let Clark Bros. back in."
> [¶] . . . [¶]

> "[T]here were reasons that the [B]oard had in making the decision and maintaining the decisions that they made based on issues that had nothing to do with performance, but everything to do with personality and resentment, personal vice."

On appeal, North Edwards contends the evidence should have been excluded as inadmissible character evidence under Evidence Code section 1101, subdivision (a). It also claims the court abused its discretion in not excluding the evidence under Evidence Code section 352.

At trial, however, North Edwards did not object under Evidence Code section 1101.[20] Accordingly, that issue is forfeited on appeal. (Evid. Code, § 353, subd. (a); *Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1020.)[21] In any event, even if we were to consider it, we would conclude the court did not abuse its discretion. Notwithstanding the general prohibition on character evidence, evidence suggesting North Edwards's bias and prejudice was admissible to rebut its claim that it fired Clark for performance deficiencies. (Evid. Code, § 1101, subd. (b) ["Nothing in this section prohibits the admission of evidence . . . when relevant to prove" motive, intent "other than [a person's] disposition to commit such an act."].)

Turning to the objection North Edwards did make, under Evidence Code section 352, a trial court may in its discretion exclude otherwise admissible evidence if its probative value is substantially outweighed by the probability that its admission will "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Id.*, § 352,

---

20 Page seven of North Edwards's motion in limine contains a "see also" string cite to Evidence Code section 1101, subdivision (a). But there is no additional argument or analysis that the recordings are inadmissible character evidence. This is insufficient to raise the point in the trial court and likewise inadequate to preserve it on appeal. (See, e.g., *Blizzard Energy, Inc. v. Schaefers* (2021) 71 Cal.App.5th 832, 857 [arguments not supported by "meaningful analysis with citations to the record and authority" are forfeited].)

21 "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ." (Evid. Code, § 353.)

subd. (d).)  In this context, prejudice refers to provoking emotional bias against a defendant, and the risk of inducing an emotional response that might engulf the dispassionate logical analysis required for the jury's factfinding duty.  (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)  On appeal, the issue is whether the trial court's ruling was arbitrary, capricious, or patently absurd, resulting in a miscarriage of justice.  (See *People v. Avitia* (2005) 127 Cal.App.4th 185, 193.)

The trial court did not abuse its discretion.  Board members calling the engineer "Chewbacca," wanting to kick Clark's "ass," and referring to a lawyer as a "weasel" who lacked "balls" are all things one might expect to hear from an immature third grader at the school yard.  But it is not the type of conduct that would likely engender an irrational emotional response by jurors.

North Edwards's racist comments are a closer call.  Racism is repugnant and potentially inflammatory.  However, evidence is not "unduly prejudicial" under Evidence Code section 352 merely because it casts a defendant in a bad light.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 50.)  Here, we cannot say the court abused its discretion.  The racial slurs were limited in number (two), and each was fleeting.  Moreover, Moyle was given an opportunity to explain before the jury that "he's another black" was not intended to be a racial slur, but rather a reference to a *person*, whose last name was "Black"—the first AECOM engineer on the Project who "wasn't really good."  Moyle testified that the engineer they called Chewbacca "lied to us just like [Mr.] Black lied to us.  So we got rid of him."

"The unfortunate reality is that odious, racist language continues to be used by some persons at all levels of our society.  While offensive, the use of such language . . . is regrettably not so unusual as to inevitably bias the jury

30

against the defendant." (*People v. Quartermain* (1997) 16 Cal.4th 600, 628.) Here, the racial slurs were only a very small portion of the evidence in a six-week trial. Clark's attorney did not focus the jury's attention on them. Accordingly, there is no reason to believe the jury found North Edwards liable for things it said, rather than for its conduct.

D.    *The Trial Court Did Not Abuse Its Discretion In Restricting Evidence of North Edwards's Limited Financial Resources*

Before trial, Clark moved to exclude evidence of the parties' financial condition. The court granted the motion, stating, "The financial position" of each party "is not going to be relevant in this case." After the ruling, North Edwards's attorney stated that in "passing" the jury would hear that North Edwards is "economically disadvantaged." Clark's attorney replied, "I don't have a problem with that . . . ."

In its final argument on appeal, North Edwards contends the court prejudicially erred in not allowing additional evidence that it "lacked the financial resources itself to pay for this Project" and instead relied on State funding. North Edwards contends the evidence would also have explained why it chose Pureflow as "the only economically feasible option" it had. Although acknowledging that evidence of a party's wealth or lack of it is ordinarily inadmissible, North Edwards contends the evidence was admissible in this case because its "economic condition was relevant to several key factual issues in this case" including its "alleged failure to mitigate."

North Edwards's contention fails to persuade because the trial court allowed it to offer the evidence and make the arguments it now claims were precluded. For example, Kostopoulos testified that North Edwards's limited financial resources necessitated that the State pay for the Project and fund progress payments. Moyle recounted that the Board "spoke[ ] at [length]"

31

with the companies participating in the pilot study, and after a "daylong meeting" determined that Pureflow was the one that "followed the scope and protocol" of the specifications.  Nothing in the court's ruling precluded North Edwards from introducing evidence of legitimate reasons for insisting on Pureflow as the sole-source filter and equipment provider.

## DISPOSITION

The judgment is affirmed.  Clark is entitled to costs on appeal.

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.